## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

HORSES OF CUMBERLAND                )
ISLAND, THE GEORGIA EQUINE          )
RESCUE LEAGUE, LTD, THE             )
GEORGIA HORSE COUNCIL, INC.,        )
WILL HARLAN, AND CAROL              )
RUCKDESCHEL                         )
                                    )
         Plaintiffs,           )
                                    )
   v.                           )      **Civil Action No.**
                                    )      **1:23-cv-01592-SEG**
                                    )
HON. DEB HAALAND, in her            )
official capacity as SECRETARY      )
OF THE INTERIOR,                    )
                                    )
MARK FOUST, in his official         )
capacity as DIRECTOR, SOUTH         )
ATLANTIC-GULF REGION,               )
NATIONAL PARK SERVICE,              )
DEPARTMENT OF THE                   )
INTERIOR,                           )
                                    )
GARY INGRAM, in his official        )
capacity as SUPERINTENDENT,         )
CUMBERLAND ISLAND                   )
NATIONAL SEASHORE,                  )
NATIONAL PARK SERVICE,              )
DEPARTMENT OF THE                   )
INTERIOR,                           )
                                    )
WALTER RABON, in his official       )
capacity as COMMISSIONER,           )
GEORGIA DEPARTMENT OF               )
NATURAL RESOURCES,                  )

1

|  | ) |
| --- | --- |
| **TYLER HARPER, in his official** | ) |
| **capacity as COMMISSIONER,** | ) |
| **GEORGIA DEPARTMENT OF** | ) |
| **AGRICULTURE,** | ) |
|  | ) |
| **and** |  |

**STATE OF GEORGIA,**

        **Defendants.**

## SPECIAL APPEARANCE MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Walter Rabon, in his official capacity as Commissioner of the Georgia Department of Natural Resources (the "Commissioner" or "DNR"), asserts by special appearance[1] that he lacks authority under any law to regulate feral horses on Cumberland Island, which is part of the federal National Park Service.[2]  The Court should dismiss Plaintiffs' claims seeking injunctive, mandamus, and other relief against the Commissioner to compel him to take action concerning the feral horses on federal and privately owned land on Cumberland Island.

---

[1] Counsel for the Commissioner appear specially, to contest the jurisdiction of this Court over Plaintiffs' Claims against the Commissioner because the Commissioner, as an agent of the State of Georgia, has not waived his Eleventh Amendment immunity.

[2] Nothing herein should be construed as conceding or agreeing that any other defendant is liable for any of the allegations in the complaint.

The Commissioner, as an agent of the State of Georgia, has Eleventh Amendment immunity to suits based on state law in federal courts.  Even if he did not, the Georgia statutes cited by Plaintiffs do not require the Commissioner to take the actions Plaintiffs seek to compel through mandamus.  Each of these legal deficits requires dismissal of the Plaintiffs' claims against the Commissioner.

## BACKGROUND

This case involves Plaintiffs' allegations that the state and federal governments have improperly allowed feral horses to live on Cumberland Island, the largest and southernmost barrier island in Georgia, to the detriment of both the Island and the horses, *see* Compl. ¶ 2[3], and that they are entitled to relief that includes removal of the horses from the Island. Compl. at Relief Requested.

Cumberland Island is mostly owned by the federal government in fee simple.  *See High Point, LLLP v. U.S. Nat. Park Serv.*, No. CV 212-095, 2015 U.S. Dist. LEXIS 24132 at *1 (S.D. Ga. Feb. 27, 2015).  Federal ownership and regulatory authority over Cumberland Island stems from Congress's

[3] Plaintiffs filed their First Amended and Restated Complaint on February 23, 2024.  ECF No. 54.  Any references to the Complaint herein, in the style of "Compl. ¶ X," are in reference to Plaintiffs' First Amended and Restated Complaint.

designation of the Island as a National Seashore in the early 1970's as part of the "Seashore Act," 16 U.S.C. § 459i; *see also United States v. 34.60 Acres of Land*, 642 F.2d 788 (5th Cir. 1981), and the Wilderness Act of 1982, that designated 8,840 acres of Cumberland Island as wilderness and an additional 11,718 acres as potential wilderness.  Pub. L. No. 97-250, 96 Stat. 709 (1982). The Seashore Act requires Cumberland Island to be permanently preserved in its primitive state, with narrow exceptions for some recreational activities, including horseback riding.  16 U.S.C. § 459i-5(b).

The National Park Service and Secretary of the Interior (the "Secretary") have general regulatory authority over Cumberland Island, including the non-federally owned lands within the bounds of the Cumberland Island National Seashore.  16 U.S.C. § 459i-5(a).  The State of Georgia retains "civil or criminal jurisdiction over persons found, acts performed, and offenses committed within the boundaries of the seashore . . . or other non-Federal property on lands included therein."  16 U.S.C. § 459i-6. Nevertheless, the National Park Service retains power to regulate the coastal marshlands, sand-sharing system, sea oats, and coastal areas in Cumberland Island National Seashore because, "federal law unambiguously displays congressional intent to empower NPS to regulate . . . ."  *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1198 (11th Cir. 2017).  The State of Georgia's

ownership of the tidelands and marshlands does not deprive the National Park Service of its regulatory authority on Cumberland Island.  *See* 36 C.F.R. § 1.2(a)(3) ("Waters . . . within the boundaries of the National Park System" are subject to National Park Service regulations.).

## PROCEDURAL POSTURE

Plaintiffs filed their original complaint on April 12, 2023.  ECF No. 1. The Commissioner filed a special appearance motion to dismiss Plaintiffs' original complaint on May 23, 2023.  ECF No. 13.  Oral Argument on the Commissioner's special appearance motion to dismiss was held before this Court on December 19, 2023.  On December 18, 2023, the eve of Oral Argument, Plaintiffs filed a motion to amend their complaint.  ECF No. 41. Plaintiffs sought to modify the allegations in their original complaint and add the State of Georgia as a named defendant.[4]  *See id*.  The Commissioner responded in opposition to Plaintiffs' first motion to amend and Plaintiffs replied to the Commissioner's response.  ECF Nos. 43, 47, 48.  On February 11, 2024, before the Court could rule on the first motion to amend, Plaintiffs

---

[4] Plaintiffs have not formally served the State of Georgia as required under Federal Rule of Civil Procedure 4 (j)(2).  At the time of this filing, Defendant State of Georgia and Plaintiffs have agreed to a waiver of formal service, a written copy of which was sent to Plaintiffs on March 22, 2024.  Nothing herein should be construed as conceding or agreeing that Defendant State of Georgia is liable for any of the allegations in the complaint.

filed a second motion to amend their complaint.  ECF No. 49.  The

Commissioner responded in opposition to this second motion to amend as

well.  ECF No. 50.  On February 23, 2024, the Court granted Plaintiffs'

second motion to amend and accepted the filing of Plaintiffs' First Amended

and Restated Complaint, which is the subject of the Commissioner's Special

Appearance Motion to Dismiss.

Plaintiffs assert that the Commissioner has neglected his obligation to

uphold the provisions of the Georgia Coastal Marshlands Protection Act,

O.C.G.A. § 12-5-280 *et seq*., the Georgia Shore Protection Act, O.C.G.A.

§ 12-5-230, *et seq*., the Sea Oat Act, O.C.G.A. § 12-5-310 *et seq*., and the

Georgia Coastal Management Act, O.C.G.A. § 12-5-320 *et seq*.  Compl. ¶ 4–5,

199.  Plaintiffs also bring claims against the Georgia Commissioner of

Agriculture under the Humane Care for Equines Act, O.C.G.A. § 4-13-1, *et*

*seq*., Georgia's prohibition against livestock running at large, O.C.G.A.

§ 4-3-1, *et seq*., and the Georgia Coastal Marshlands Protection Act, O.C.G.A.

§ 12-5-280 *et seq*.  *Id*.  Plaintiffs also allege that the State of Georgia owns the

horses, and that the Commissioner, as a state agent, therefore is in violation

of the Endangered Species Act, 16 U.S.C. § 1531 *et seq*. ("ESA"), based on the

horses' impacts on endangered species.

Plaintiffs seek the removal of the horses from Cumberland Island. Plaintiffs seek a writ of mandamus or, alternatively, an injunction against the Commissioner to prevent the horses from running at large.  Compl. at Relief Requested, ¶¶ 6–8.  They also seek a writ of mandamus to compel the Commissioner to prevent the horses from damaging the environment, including the shoreline and sea oats.  *Id.* at Relief Requested, ¶ 8.  They seek an injunction "directing the State of Georgia, by and through its officials" to protect loggerhead sea turtles, piping plover, and their habitats from the horses.  *Id.* at Relief Requested, ¶ 9.  Finally, they seek an injunction and a writ of mandamus requiring "the Georgia Department of Agriculture, Equine Division" to assess and provide for the health and well-being of the horses until they are removed from the island.  *Id.* at Relief Requested, ¶¶ 12–13.

The Commissioner requests that this Court dismiss all claims against him because Plaintiffs' claims are barred by the Eleventh Amendment and sovereign immunity and fail to state a claim upon which relief may be granted.

## ARGUMENT

### I.    Georgia's Sovereign Immunity requires dismissal of Plaintiffs' claims.

#### A. The Eleventh Amendment requires dismissal of Plaintiffs' claims.

7

"It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). The Commissioner, as an agent of the state, has not consented to suit and Plaintiffs' claims against the Commissioner should therefore be dismissed.

The Eleventh Amendment bars actions against a state, its agencies, and its officials absent a waiver by the State or a valid congressional override. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Pennhurst*, 465 U.S. at 100-01. The Eleventh Amendment bars suits against states by citizens of other states as well as citizens of the state involved. *Hans v. Louisiana*, 134 U.S. 1, 10 (1890). The U.S. Supreme Court has unambiguously held that "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Ed. of Trs. of Uni v. of Ala. v. Garrett*, 531 U. S. 356, 363 (2001). This "general principle of state sovereign immunity has been adhered to without exception by this Court for almost a century." *Welch v. Texas Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 493-494 (1987) (citing cases); *Freyre v. Chronister*, 910 F.3d 1371, 1380 (11th Cir. 2018) ("The Supreme Court has extended"

Eleventh Amendment sovereign immunity "to bar suits against a state in federal court brought by the state's own citizens.").

*Ex Parte Young*, 209 U.S. 123 (1908) creates a narrow exception whereby federal courts may render judgment on state officers who violate federal law. *Id*. at 160. Plaintiffs allege that the Commissioner has violated the ESA by permitting the feral horses to roam Cumberland Island. Compl. ¶ 131. As explained in more detail below, Plaintiffs have failed to show a violation of the ESA because the Commissioner has taken no action likely to cause harm to endangered species, nor committed a taking of any endangered species protected by the ESA. Plaintiffs' failure to raise a valid federal law claim against the Commissioner precludes this Court from hearing any of Plaintiffs' state law claims against the Commissioner.

Even if Plaintiffs had raised a valid ESA claim against the Commissioner, supplemental jurisdiction does not overcome Eleventh Amendment sovereign immunity, which bars Plaintiffs' state law claims. In *Pennhurst State School & Hospital v. Halderman*, the United States Supreme Court explicitly held that "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." 465 U.S. 89, 92 (1984). The codification of supplemental jurisdiction, 28 U.S.C. § 1367, does not waive state sovereign immunity under the Eleventh Amendment, nor has

any Court interpreted it to do so.  *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 541 (28 U.S.C. § 1367 does not waive state sovereign immunity because even "an express grant of jurisdiction over [state law] claims would be an abrogation of the sovereign immunity guaranteed by the Eleventh Amendment.").

   Plaintiffs' state law claims should be dismissed because the Commissioner has not waived his sovereign immunity, there are no federal law claims against the Commissioner, and the Court should not exercise supplemental jurisdiction to hear state law claims even if Plaintiffs' federal claim against the Commissioner were valid.

**B. The Georgia Constitution also bars Plaintiffs claims.**

   Under the Georgia Constitution, sovereign immunity of the state and its departments and agencies "can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver."  Ga. Const. art. I, § II, ¶ IX(e); *see also Ga Dep't of Natural Res. v. Ctr. for a Sustainable Coast, Inc.*, 294 Ga. 593, 598-99 (2014).  Additionally, the Georgia Constitution states that "[n]o waiver of sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution."  Ga. Const. art. I,

§ II, ¶ IX(f).  Moreover, the Eleventh Circuit has recognized that "evidence that a state has waived sovereign immunity in its own courts is not by itself sufficient to establish waiver of Eleventh Amendment immunity from suit in federal court."  *Schopler v. Bliss*, 903 F.2d 1373, 1379 (11th Cir. 1990). Waivers of immunity are strictly construed in favor of the sovereign. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011).

In 2020, the Georgia General Assembly codified a limited express waiver of immunity for actions seeking declaratory and ensuing injunctive relief against the State.  Ga. Const. art. I, § II, ¶ V (b)(1) ("Paragraph V"). Paragraph V stipulated that such actions must be brought "exclusively against the state and in the name of the State of Georgia," and any actions brought pursuant to Paragraph V naming any party other than the State shall be dismissed.  Ga. Const. art. I. § II, ¶ V (b)(2); s*ee also State v. Sass Grp., LLC*, 315 Ga. 893, 904 (2023) ("[I]f a lawsuit is filed against the State pursuant to Paragraph V and that suit includes an independent claim against another party not specified in that paragraph's waiver provision, then the entire lawsuit must be dismissed . . . .  Thus, the presence of a named defendant to whom Paragraph V's waiver does not apply is fatal to an 'action' that relies on Paragraph V's waiver of sovereign immunity.").

Plaintiffs seek relief against the Commissioner in the form of "findings" by this Court that the Commissioner, along with the other defendants, is the joint owner of the feral horses and is failing to properly manage the feral horses, in violation of federal and state law.  Compl. at Relief Requested ¶¶ 1–3.  While Plaintiffs label the relief sought as findings by the Court, the relief appears declaratory in nature.  Were the relief requested not declaratory, it would have no lasting impact beyond the Court's statements that the findings are accurate under the law.  Such relief would not comport with the spirit of Plaintiffs' complaint, nor would it authorize this Court to award Plaintiffs any injunctive relief.  To that end, Plaintiffs seek injunctive relief against the Commissioner as well, which is connected to the requested declaratory relief.  Compl. at Relief Requested ¶ 7, 9.  Such declaratory and injunctive relief is only available in an action brought exclusively against the State.  *See Sass Grp.*, 315 Ga. at 904.  Of course, Plaintiffs have named the Commissioner and multiple other state and federal defendants in this action. The presence of these other named defendants precludes Plaintiffs from taking advantage of Paragraph V's limited waiver of sovereign immunity, and ultimately requires the dismissal of Plaintiffs' complaint.  *See id.*

## II.    Commissioner Rabon does not have regulatory jurisdiction over the Cumberland Island National Seashore.

The Cumberland Island National Seashore Act, 16 U.S.C. §§ 459i-1–9, grants the Secretary administrative jurisdiction over all lands within the Seashore, authority to acquire non-Federal property within the boundaries of the Seashore, and further administer, protect, and develop the Seashore. 16 U.S.C. §§ 459i1-5. While the State of Georgia maintains its civil and criminal jurisdiction, and its right to tax non-federal property within the Seashore boundaries, 16 U.S.C. § 459i-6, the Secretary retains her regulatory authority within the federal boundaries of the Seashore, 36 C.F.R § 1.2(a)(1), even over the tidelands and marshlands owned by the State of Georgia. *Id.* at § 1.2(a)(3). The Secretary holds regulatory jurisdiction over all lands within the boundaries of the Seashore, regardless of whether such lands are owned by the federal or state government, or private property owners.

## A. The Eleventh Circuit and others have consistently recognized the National Park Service's regulatory authority within the boundaries of federal wilderness areas, regardless of property ownership.

The Court of Appeals for the Eleventh Circuit has held that the Secretary holds regulatory authority over lands within the Seashore boundaries, including, but not limited to coastal marshlands owned by Georgia, the sand-sharing system, sea oats, and the coastal area, within the boundaries of the Seashore. In *High Point, LLLP v. United States National*

13

*Park Service*, the Eleventh Circuit rejected the argument that "the Park Service has no regulatory authority over the marshlands because the State of Georgia—rather than the federal government—holds title to them" and instead held that "[r]egardless of who actually owns [the land within the boundaries of the Seashore], federal law unambiguously displays congressional intent to empower NPS to regulate the [lands within the boundaries of the Seashore] . . . in particular, NPS's establishing law and the Seashore Act make this fact abundantly clear." *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1198 (11th Cir. 2017).

Like the Plaintiffs in this case, other plaintiffs have tried, and failed, to abrogate federal regulatory authority in favor of state regulatory authority within National Park Service boundaries. *Id.* at 1199 ("As several [other circuits] have recognized, this regulatory authority extends to non-federally owned land encompassed within national park boundaries.") *citing Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431 442, (5th Cir. 2011); *United States v. Stephenson*, 29 F.3d 162, 164 (4th Cir. 1994) ("[t]he primary inquiry in determining the applicability of Park laws to a given area must therefore be whether that area is within the statutory boundaries of the Park, not whether [the Park Service] holds title to the land in question"); *Free Enterprise Canoe Renters Assoc. v. Watt*, 711 F.2d 852, 856

14

(8th Cir. 1983); *see also Ctr. for a Sustainable Coast & Karen Grainey v. Nat'l Park Serv.*, 454 F. Supp. 3d 1347, 1349 (S.D. Ga. 2020) ("[Privately-owned land acquired by the Department of the Interior], along with all other property within the bounds of the Cumberland Island National Seashore, is managed by Defendant [National Park Service].").  The Congress reached the same conclusion as the Eleventh Circuit, as the House and Senate reports accompanying the Seashore Act expressed the intent that NPS manage the Seashore even though the reports "acknowledged that the State of Georgia – and not the United States – held title to the intertidal marshlands designated as potential wilderness."  *Id*. at 1200.

### B. Plaintiffs state law claims fail because the Commissioner cannot implement state laws when he lacks jurisdiction.

Despite clear precedent, statutes, and regulations granting the National Park Service regulatory authority within the Seashore boundaries, Plaintiffs allege that the Commissioner has failed to implement the Coastal Marshlands Protection Act, O.C.G.A. §§ 12-5-280 – 297, the Georgia Shoreline Protection Act, O.C.G.A. §§ 12-5-230 – 248, the Sea Oat Act, O.C.G.A. §§ 12-5-310 - 312, and the Georgia Coastal Management Act, O.C.G.A. §§ 12-5-320 – 329, within the lands that are within Georgia's public trust and within the Seashore boundaries.  Compl. ¶¶ 203-11 ("Georgia holds

the coastal marshlands, the sand-sharing system (including the sea oats), and the entirety of the natural resource system supporting the coastal area in public trust . . . .").  As explained in the prior section, the National Park Service's authority extends to all areas within the Seashore's boundaries that would otherwise be protected under those Georgia laws.

Plaintiffs' claims should be dismissed because the Commissioner cannot be compelled to implement Georgia statutes and regulations where Congress has granted the Park Service "protective authority over those tidal marshlands within the boundaries of Cumberland Island National Seashore . . . ." *High Point*, 850 F.3d at 1200.  The Commissioner holds no authority to manage or regulate activities within the boundaries of the Seashore, even on lands within the Seashore owned by the State.  DNR has no jurisdiction to manage land or activities within the boundaries of the Seashore.  Thus, the Commissioner cannot be compelled to take any action removing the horses from Cumberland Island.

### III.   Plaintiffs have failed to state a claim upon which relief may be granted against the Commissioner.

Plaintiffs have alleged violations of the ESA and various state laws, none of which can support a claim for relief against the Commissioner. Federal Rule of Civil Procedure 12(b)(6) allows this Court to dismiss a

complaint that "fail[s] to state a claim upon which relief may be granted."  A complaint will be dismissed under Rule 12(b)(6) unless it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is "plausible" where the plaintiff has pleaded facts sufficient to allow the court to reasonably infer that the defendant is liable.  *Id.*  Plaintiffs may not survive Rule 12(b)(6) through mere "labels and conclusions, [or] a formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 555.

## A. Plaintiffs have failed to plead a plausible claim under the ESA.

In Count Four, Plaintiffs allege violations of the ESA.  *See* Compl. ¶¶ 124–170.  Specifically, Plaintiffs allege that the Defendants have collectively failed to prevent Plaintiff feral horses from running at large, thereby harming two endangered species: the loggerhead sea turtle (*Caretta caretta*) and the piping plover (*Charadrius melodus*).  *See id.* ¶¶ 132–170. Plaintiffs allege the harm to the loggerhead sea turtle and the piping plover caused by the feral horses have resulted in illegal takings of both species, violating ESA §§ 7(a)(2) and 9(a)(1)(B).  *See id.*  However, Plaintiffs have failed to state a plausible claim for relief against the Commissioner because Plaintiffs cannot point to an action the Commissioner has taken resulting in

a violation of the ESA.  Plaintiffs point only to their own—the horses'—actions.  And to the extent Plaintiffs seek to hold the Commissioner responsible for the horses' actions, the Commissioner has not committed a taking of either the loggerhead sea turtle or the piping plover, as the State is not the owner of the feral horses and is not liable for any harm the horses may cause.

### i.   The Commissioner has not taken any action requiring consultation under § 7(a)(2) of the ESA.

The ESA requires agencies to "consult with the Fish and Wildlife Service before taking an 'action' to ensure that such action is not likely to jeopardize the continued existence of any endangered species or its habitat." *Ctr. for Biological Diversity, Manasota-88, Inc. v. United States Army Corps of Eng'rs*, 941 F.3d 1288, 1305 (11th Cir. 2019) (referencing 16 U.S.C. § 1536 (a)(2)); *see also Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008).  "Action means all activities or programs of any kind authorized,

funded, or carried out, in whole or in part, by Federal agencies."  *Id.*
(referencing 50 C.F.R. § 402.02).

Plaintiffs allege that the Commissioner has violated § 7(a)(2) via an
"ongoing policy to permit[5] livestock from running at large . . . causing direct
harm to protected species."  Compl. ¶ 131.  However, Plaintiffs fail to point to
any action or program authorized, funded, or carried out by the
Commissioner, or any of the defendants, whereby a policy to permit feral
horses to run at large was adopted or implemented.  The Ninth Circuit has
previously ruled that "[t]he language [of § 7(a)(2)] does indicate that some
agency actions are not covered – those the agency does *not* authorize[], fund[],
or carry out[,]" and that "inaction is not action for section 7(a)(2) purposes."
*W. Watersheds Project v. Matejko*, 456 F.3d 922, 931 (9th Cir. 2006) (internal
quotation marks omitted).  "The existence of [agency] discretion without more
is not an 'action' triggering a consultation duty."  *Id.*

Plaintiffs have not pointed to any affirmative actions undertaken or
policies adopted by the Commissioner resulting in a taking of the loggerhead
sea turtles or piping plovers residing on Cumberland Island.  Any alleged

---

[5] For purposes of this motion to dismiss, the Commissioner assumes Plaintiffs
intended to allege that the Defendants have adopted a policy permitting the horses
to run at large.  The Commissioner does not concede that any such policy exists or
has been adopted.

failure on the part of the Commissioner to prevent other wildlife, such as the feral horses, from engaging in natural activities, which may or may not cause harm to listed endangered species, cannot be construed as an affirmative action triggering a consultation duty under § 7(a)(2). All previous Eleventh Circuit cases reviewing issues under § 7(a)(2) have involved some affirmative action undertaken by a federal or state agency. Plaintiffs have offered no legal support or justification for the theory that total inaction on the part of an agency somehow amounts to an affirmative action triggering the consultation requirements of § 7(a)(2). Particularly when considered in the context of wildlife engaging with other wildlife, Plaintiffs' unsupported inaction-as-action theory is contrary to existing caselaw and could lead to absurd results.

The case most analogous to the present matter is *Palila v. Hawaii Dep't of Land & Natural Resources*, 471 F. Supp. 985 (D. Haw. 1979) (*aff'd* by *Palila v. Hawaii Dep't of Land & Natural Resources*, 639 F.2d 495 (9th Cir. 1981)). In *Palila*, the district court found that the Hawaii Department of Land and Natural Resources was violating the ESA by actively maintaining feral herds of sheep and goats on the forested slopes of Mauna Kea, an area designated as critical habitat for an endangered species of bird. *Id.* at 999. The feral sheep and goats were eating the leaves, stems, seedlings, and

sprouts of mamane trees, thus preventing regeneration of the forest and damaging critical habitat. *Id*. at 989-90. The court also determined that "complete removal" of the feral sheep and goats from the critical habitat was feasible. *Id*. at 990. Thus, the court found that the department's policies were resulting in ESA violations through the activities of the sheep and goats and ordered the adoption of a program to humanely eradicate the sheep and goats from the critical habitat. *Id*. at 999.

The critical difference between the situations in *Palila* and on Cumberland Island is the presence of an agency action in *Palila* and the absence of an agency action here. In *Palila*, the department had an established policy of maintaining the sheep and goats in the critical habitat to protect the interests of hunters, through methods including cross breeding the animals and instituting bag limits that allowed but regulated hunting to sustain the populations. *See id*. at 989 n. 9. There is no such affirmative agency policy for feral horses on Cumberland Island, who roam the island free of any regulation or agency interaction. There is no management policy in place for the feral horses on Cumberland Island that is authorized, funded, or carried out by the state. The absence of such a policy cannot be construed as an "ongoing policy" triggering the consultation requirements under § 7(a)(2), as Plaintiffs suggest because there is simply nothing to consult

21

about.  *See Matejko*, 456 F.3d at 931.  Because the Commissioner has taken

no action concerning the feral horses, there is no action for this Court to

review under § 7(a)(2).

Concerning the endangered loggerhead sea turtle specifically, Plaintiffs

point to a "Management Plan for the Protection of Nesting Loggerhead Sea

Turtles and Their Habitat in Georgia" ("Management Plan") which they

allege the Commissioner is violating by allowing the horses to roam free.  *See*

Compl. ¶¶ 139–146.  The Management Plan is not a policy or action of the

Commissioner.  The Management Plan is a set of recommendations for sea

turtle conservation that was drafted by the Georgia Loggerhead Sea Turtle

Protection and Management Committee and sent to a former Commissioner

of the Georgia Department of Natural Resources for his consideration.  This

recommended management plan is not an affirmative agency action.  *See Ctr.*

*for Biological Diversity, Manasota-88, Inc.*, 941 F.3d at 1306 (an area-wide

environmental impact statement that led to the U.S. Army Corps of

Engineers' decision to issue a Section 404 Permit was not itself an "agency

action" because "it did not direct or authorize the Corps' substantive decision

to issue the Section 404 permit under the Clean Water Act or otherwise bind

the agency to take any future action."); *see also NRDC v. Nat'l Park Serv.*,

250 F. Supp. 3d 1260, 1310 (M.D. Fla. 2017) ("Resource management plans

generally do not constitute 'agency action' requiring ESA consultation under Section 7 . . . . [S]pecific activities, programs, and/or projects are necessary to implement the plan.") (internal quotation marks and citations omitted).

Even to the extent that the Management Plan could be considered an agency policy, it provides no guidance for managing sea turtle predation by feral horses. The Management Plan addresses the negative impacts of feral hog and raccoon predation on sea turtles and sea turtle nesting habitat. *See* Compl. Ex. D p. 5. The Management Plan then calls for "rigorous control of hogs" on Georgia's barrier islands and sets out other recommendations for how to minimize the effects of these predators on the sea turtles. *See id*. By contrast, the Management Plan makes no recommendations regarding feral horses or their alleged predation. Therefore, any inaction on the part of the Commissioner concerning the feral horses is not in conflict with the Management Plan, much less a violation of § 7(a)(2). Because Plaintiffs have

failed to identify an action of the Commissioner triggering the requirements

of § 7(a)(2), Plaintiffs have failed to state a plausible claim under the ESA.

**ii.   The Commissioner has not committed a taking of the loggerhead sea turtle or the piping plover under § 9(a)(1)(b) of the ESA.**

The ESA prohibits any person from "tak[ing] any [endangered species]

within the United States or the territorial sea of the United States."  16

U.S.C. § 1538(a)(1)(B).  The ESA defines a "person" as:

> an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

16 U.S.C. § 1532(13).

"The term 'take' means to harass, harm, pursue, hunt, shoot, wound,

kill, trap, capture, or collect, or attempt to engage in any such conduct."

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879

F.3d 1142, 1145 (11th Cir. 2018). "Harm" is defined as "to cause hurt or

damage to: injure," and "Harass" means "to vex, trouble, or annoy continually

or chronically." *Id*. at 1146.

Plaintiffs allege that the feral horses are harming and harassing the

loggerhead sea turtles and piping plovers on Cumberland Island by

interfering with behavioral patterns and by damaging critical habitat. *See*

Compl. ¶¶ 146; 157–59. Plaintiffs fail to allege any action taken by the

Commissioner amounting to "harm," "harassment," or a "taking" under the

ESA. Accepting the factual allegations in Plaintiffs' complaint as true, no

taking has occurred at all, since no "person" has harmed or harassed the

turtles or plovers—Plaintiff feral horses are the only entities alleged to have

committed takings of the two endangered species. *See Coalition v.*

*McCamman*, 725 F. Supp. 2d 1162, 1168 (E.D. Cal. 2010) ("A fish cannot

'take' another fish under the ESA, because only a 'person' can violate the

ESA's take prohibition . . . [A] fish is not a 'person,' at least not for purposes

of the ESA."). To the extent that Plaintiffs allege the Commissioner has

vicariously committed a taking through the actions of the feral horses, the

argument is baseless. As explained in more detail below, the Commissioner

is not the owner of the horses under any of Plaintiffs' legal theories and

cannot be held responsible simply for one animal's alleged predation of or

effects on another. Because Plaintiffs have failed to identify an act of the

Commissioner that resulted in a taking of either the loggerhead sea turtle or

the piping plover, Plaintiffs have failed to state a plausible claim under

§ 9(a)(1)(b) of the ESA.

## B. Plaintiffs have not alleged any violations of the Coastal Marshland Protection Act, Shore Protection Act, Sea Oat Act, or Coastal Management Act that could support a claim for relief.

In Count Seven, Plaintiffs allege that allowing the horses to remain on

Cumberland Island violates the Coastal Marshlands Protection Act, Shore

Protection Act, Sea Oats Act, and Coastal Management Act because the

horses are harmful to Georgia's coastal areas and vegetation. *See Compl.* ¶¶

201-11. Tellingly, Plaintiffs do not point to any discrete actions required by

those acts, and instead seek a writ of mandamus "requiring. . .the

Commissioner of the Department of Natural Resources to take such action as

will place [him] in compliance with the statutes identified above and in

fulfillment of [his] public trust duties," but leave it to the imagination as to

what those actions may be. *See* Compl. ¶ 211, Relief Requested at ¶ 8.

Under Georgia law, mandamus is only appropriate where an applicant

"seeks to compel the performance of a public duty that an official or agency is

required by law to perform." *Bibb County v. Monroe County*, 294 Ga. 730, 735

(2014). When an official has "discretion with regard to whether action is

required in a particular circumstance, mandamus will not lie, because there

26

is no clear legal right to the performance of such an act." *Id.* "[T]he mere authorization to act is insufficient [to support mandamus] unless the law requires performance of the duty." *Bland Farms v. Ga. Dep't of Agriculture* 281 Ga. 192, 193 (2006) (affirming denial of mandamus where farmers sought to compel Georgia's Commissioner of Agriculture to take enforcement action against other farmers).

The Coastal Marshlands Protection Act and Shore Protection Act are alike in structure. The Coastal Marshlands Protection Act prohibits the unpermitted alteration of any marshlands and the unpermitted construction or location of structures in the state's estuarine area. O.C.G.A. § 12-5-286. The Shore Protection Act prohibits unpermitted construction, shoreline engineering, or land alteration altering the natural topography or vegetation of covered shore areas. O.C.G.A. § 12-5-237. Both statutes establish permitting systems and committees within DNR to help oversee and enforce the acts. O.C.G.A. §§ 12-5-235, 12-5-237, 12-5-283, 12-5-286. Enforcement of the acts may be taken against "any person" who violates the acts and may take the form of administrative orders, fines, injunctive relief, criminal sanctions, or actions for damages. O.C.G.A. §§ 12-5-245, 12-5-247, 12-5-248, 12-5-290, 12-5-291, 12-5-296, 12-5-297.

Plaintiffs have failed to state a claim under either the Coastal Marshlands Protection Act or Shore Protection Act because they fail to identify any public duty the Commissioner is required by law to perform. *See Bibb County*, 294 Ga. at 735. Plaintiffs allege that the horses are impairing Georgia's coastal marshlands and shores. Compl. ¶ 208. Taking that allegation as true, Plaintiffs have not identified a "person" engaging in unpermitted activity in violation of either act. *See* O.C.G.A. §§ 12-5-237, 12-5-286.[6] At most, Plaintiffs have alleged that the *horses* have violated the acts and, pretermitting whether a horse could be a "person" subject to administrative enforcement, Plaintiffs' allegations cannot support relief against the Commissioner because the Commissioner's decision to take enforcement action is purely discretionary and not appropriate for mandamus. *See Bland Farms*, 281 Ga. at 193.

Even if the Commissioner could and chose to take enforcement action against horses, the available enforcement actions under the acts include

---

[6] *See also Jones v. Fransen*, 857 F.3d 843, n.8 (11th. Cir. 2017) (noting that O.C.G.A. § 50-21-22(7) defines "[s]tate officer or employee" to include "law enforcement officers," which uses the word "person" or "persons" multiple times and does not appear to contemplate the inclusion of animals, specifically K-9 officers); *see also Id. at* n.9 (noting that the Dictionary Act, 1 U.S.C. § 1, the statute used to determine "the meaning of any Act of Congress," does not include "dogs" in its definition of "person.").

administrative and legal proceedings against violators, not removal of the violators.  *See* O.C.G.A. §§ 12-5-245, 12-5-247, 12-5-248, 12-5-290, 12-5-291, 12-5-296, 12-5-297.  Therefore, Plaintiffs have failed to state a claim upon which relief may be granted under the Coastal Marshlands Protection Act or the Shore Protection Act.  *See Iqbal*, 556 U.S. at 678.

Plaintiffs similarly cannot receive mandamus relief against the Commissioner under the Sea Oats Act or Coastal Management Act.  The Sea Oats Act makes it unlawful "to cut, harvest, remove, or eradicate" sea grasses from public or private lands "without the consent of the owner . . . or the persons having lawful possession thereof."  O.C.G.A. § 12-5-311.  The act is not within the administrative jurisdiction of DNR, but instead provides for criminal sanctions.  *See* O.C.G.A. § 12-5-312 (making violation of the act a misdemeanor).  The Coastal Management Act requires DNR to prepare, submit, and administer a coastal management program and to coordinate with federal, state, and local agencies concerning coastal management.  O.C.G.A. § 12-5-323.

Plaintiffs allege that the horses have removed sea oats, but the Commissioner has no authority—much less a duty required by law—to prosecute criminal offenses, particularly against horses.  *See Bibb County*, 294 Ga. at 735.  Further, Plaintiffs cannot receive mandamus relief

concerning Georgia's coastal management plan because it merely authorizes, it does not compel, the Commissioner to "prepare and administer a Georgia coastal management program." *See id.*; O.C.G.A. § 12-5-323(1).  It is undisputed here that the Commissioner has adopted and implemented a coastal management plan—the only action required under that act.  Plaintiffs do not explicitly seek, and could not properly obtain, a writ of mandamus compelling the Commissioner to adopt a new management plan, or modify the current management plan, to include removal of the feral horses because his "mere authorization" to impound the horses cannot support mandamus. *See Bland Farms*, 281 Ga. at 193; O.C.G.A. § 12-5-323.  There is no express authorization in the act requiring the Commissioner to adopt specific stipulations in the coastal management program, much less a requirement to remove feral horses.  Accordingly, Plaintiffs have failed to state a plausible claim for mandamus relief concerning the Sea Oats Act or the Coastal Management Act.  *See Iqbal*, 556 U.S. at 678.

## C. Plaintiffs have failed to plead a plausible claim for relief under the Georgia Care for Equines Act.

In Count Five, Plaintiffs allege violations of Georgia's Humane Care for Equines Act, O.C.G.A. § 4-13-1, *et seq*, and seek a writ of mandamus to compel the Commissioner "to immediately comply with their obligations to

the feral horses" under the act.  *See* Compl. ¶¶ 171–89.  The act cannot

support such relief.

The Humane Care for Equines Act prohibits "the owner of any equine"

from engaging in various inhumane activities, including failing to provide

adequate food, water, or care.  O.C.G.A. § 4-13-3.  The act defines an "owner"

as "any person owning, having possession or custody of, or in charge of an

equine."  O.C.G.A. § 4-13-2(4).  Enforcement of the act falls to the

Commissioner of Agriculture, his designated agent, or local law enforcement

officers.  *See* O.C.G.A. § 4-13-4.

Plaintiffs allege that "the State of Georgia" is an owner of the horses of

Cumberland Island because it is "'in custody or in charge' of the horses."  *See*

Compl. ¶ 184.  Plaintiffs' factual allegations elsewhere in the complaint

demonstrate that the State *cannot* be an owner of these horses, however.  As

Plaintiffs explain, the horses "were once domesticated, but have reverted to a

*wild* state and no longer receive human support for their survival."  Compl.

¶ 10 (emphasis added).  Count One of the complaint goes further, relying in

part on 50 C.F.R. § 30.11(a), which applies to "[f]eral animals, including

horses . . . *without ownership* that have reverted to the wild from a domestic

state." (emphasis added).  Taking as true Plaintiffs' allegations that the

horses are formerly domesticated animals that have reverted to a wild, feral

31

state, the horses necessarily have no owner.  *See* 50 C.F.R. § 30.11(a).  Thus, to the extent Plaintiffs allege that the Commissioner has liability as an owner, they have failed to state a claim upon which relief may be granted. *See Iqbal*, 556 U.S. at 678.

Finally, the Commissioner has no duties or authority under the Humane Care for Equines Act.  *See Bibb County*, 294 Ga. at 735; *see generally* O.C.G.A. § 4-13-1, *et seq*.  To the extent any state official has any authority under the act, the Commissioner of Agriculture is the sole state official identified therein.[7]  *See* O.C.G.A. § 4-13-4.  Therefore, to the extent Plaintiffs are alleging a failure to act under the Humane Care for Equines Act, they have not stated a claim upon which relief may be granted.  *See Iqbal*, 556 U.S. at 678.

### D. Plaintiffs have failed to allege a plausible violation of Georgia's prohibition against livestock running at large.

Plaintiffs also seek a writ of mandamus concerning Georgia's prohibition on livestock running at large.  Compl. ¶¶ 190-200.  Plaintiffs again assert that the State owns the horses and seek a writ of mandamus "requiring the appropriate State Defendants to take such steps as are

---

[7] Nothing herein should be construed as conceding or agreeing that the Commissioner of Agriculture or any other defendant is liable for any of the allegations in the complaint.

necessary to prevent the horses on Cumberland Island from free-ranging, running at large, or straying." *Id*. ¶ 200.

Georgia law states that "[n]o owner shall permit livestock to run at large on or to stray upon the public roads of this state or any property not belonging to the owner of the livestock, except by permission of the owner of such property.," O.C.G.A. § 4 3 3. "Owner," in this context, is defined as "any person . . . owning, having custody of, or in charge of livestock." O.C.G.A. § 4-3-2(2). The act states that "[i]t shall be the duty of the sheriff, his deputies, or any other county law enforcement officer" to impound livestock running at large and to care for the impounded livestock until such time as they are sold or killed." O.C.G.A. §§ 4-3-4 through 4-3-9.

For all of the reasons that the Commissioner and the State are not "owners" under the Humane Care for Equines Act, they also are not "owners" for purposes of livestock running at large. *See* O.C.G.A. § 4-3-2(2). It is further worth noting that, for purposes of livestock running at large, even if the Defendants were "owners," the law only prohibits running at large or straying on the property of another without permission, and Plaintiffs' ownership theory is premised at least in part on the idea that the Defendants own Cumberland Island. Regardless, because the feral horses are, by

definition, without an owner, *see* Compl. ¶¶ 10, 71, 73, the State Defendants are not "owners" of the horses for purposes of O.C.G.A. § 4 3 3.

More important to Plaintiffs' mandamus claim, however, is that the statute expressly places the duty of impounding straying livestock on *county* officials, not the Commissioner.  *See* O.C.G.A. §§ 4-3-4 through 4-3-9.  The Commissioner therefore cannot be compelled through mandamus to take action here because he is not the official with a public duty that is required by law to be performed.  *See Bibb County*, 294 Ga. at 735.  Accordingly, to the extent Plaintiffs seek relief against the Commissioner in Count Six, they have failed to state a plausible claim upon which relief may be granted.  *See Iqbal*, 556 U.S. at 678.

## CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court dismiss all claims against the Commissioner.

Respectfully submitted this 22nd day of March, 2024.

*This submission has been prepared in accordance with the font and point selections approved in LR 5.1(b).*

CHRISTOPHER M. CARR                    112505
Attorney General

ROBIN J. LEIGH                                   445845
Deputy Attorney General

34

/s/ Christopher R. Held
CHRISTOPHER R. HELD                         987847
Assistant Attorney General

/s/ Griffin W. Ingraham
GRIFFIN W. INGRAHAM                         773148
Assistant Attorney General

Please address all communications to:

Christopher R. Held
Assistant Attorney General
Office of the Attorney General
40 Capitol Sq. SW
Atlanta, GA 30334
Tel: (404) 458-3569
Fax: (404) 651-6341
cheld@law.ga.gov