## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

HORSES OF CUMBERLAND ISLAND,               )
THE GEORGIA EQUINE RESCUE LEAGUE, LTD, )
THE GEORGIA HORSE COUNCIL, INC.,           )
WILL HARLAN, AND CAROL RUCKDESCHEL  )
                                           )
                      PLAINTIFFS,          )      CIVIL ACTION
                                           )      File No.
                             v.            )      1:23-cv-0592-SEG
                                           )
                                           )
HON. DEB HAALAND, in her official capacity as )
SECRETARY OF THE INTERIOR, et al.          )
                                           )
                      DEFENDANTS.          )
_____)

## I. Introduction.

Cattle running-at-large as livestock were removed from the Seashore by the

Defendants in the 1980's.   Starting in the 1990's the Defendants began managing

and removing feral hogs as livestock from the Seashore.   Cumberland Island

National Seashore just received $760,000 through the Inflation Reduction Act to

further the "feral swine reduction" program.   Consistent with Defendants acts in

removing and controlling cattle and hog livestock, Plaintiffs seek to have the

Defendants manage the feral horse herd and prevent the horses from running-at-

large on Cumberland Island.   Rather than work collaboratively towards this end

and towards the betterment of both the Island's natural resources and the well-

being of the horses, Defendants have chosen to simply seek to dismiss Plaintiffs'

complaint.   As set forth below Defendants' attempts to dismiss Plaintiffs' complaint are without merit and should be denied by this Court.

## II.  NATIONAL PARK SERVICE AND THE HORSES OF CUMBERLAND

Defendant NPS has acted either through direct omission, negligent management, or through unreasonable delay (or a combination of all) to allow the horses, in the natural course of their existence, to run at large through Cumberland Island and in so doing inflict serious harm to the Island's natural and wilderness resources in violation of the law.

The Secretary of the Interior is authorized to promulgate rules and regulations to effectuate the goals of Congress in preserving and managing the National Parks, including the Cumberland Island National Seashore. *U.S. v. Brown*, 364 F.3d 1266, 1276 (11th Cir. 2004) ("[I]n Title 16, Congress delegated to the Secretary the authority to promulgate rules and regulations that were necessary and proper to effect Congress's stated goal of preserving and managing national parks.").  The rules codified at Chapter 36 of the C.F.R. charge those - such as the Defendants - with "the proper use, management, government, and protection of persons, property, and natural and cultural resources within areas under the jurisdiction of the National Park Service."  36 C.F.R. 1.1(a).  Defendant NPS has plenary authority to manage the Cumberland Island National Seashore

including its wildlife resources.   The horses of Cumberland are considered not only wildlife[1] but also feral animals[2], non-native species[3], and livestock[4].

## III. STATUTORY AND REGULATORY FRAMEWORK

### A.  Organic and General Authorities Act- Duty to Prohibit Impairment.

The National Park Service Organic Act of 1916 ("Organic Act") established NPS and created its authority over the maintenance of national parks. 16 U.S.C. §§ 1-18f-3.   The Organic Act was recodified in 2014 at 54 U.S.C. 100101(a).   The Organic Act provides that NPS must "regulate the use" of national parks by means that conform to their "fundamental purpose," namely:

to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects,

---

[1]  36 C.F.R. defines "wildlife" to mean *Wildlife* means any member of the animal kingdom and includes a part, product, egg or offspring thereof, or the dead body or part thereof, except fish.

[2] See Cumberland Island National Seashore website: https://www.nps.gov/cuis/learn/nature/feral-horses.htm.

[3] *Id*.

[4] *Id*. See also Livestock Plan for Theodore Roosevelt State Park, Environmental Assessment; Sept. 2023; document available at: https://parkplanning.nps.gov/document.cfm?parkID=167&projectID=105110&documentID=132035  NPS defines "Livestock" to "include any species of animal that has been selectively bred by humans for domestic and agricultural purposes, including, but not limited to, cattle, sheep, horses, burros, mules, goats, and swine."  *Id*. at fn 1.   The Plan highlights NPS Management Policies (2006), specifically "Policy 4.4.4 states that exotic species will not be allowed to displace native species if such displacement can be prohibited, and Policy 4.4.4.2 addresses management, up to and including eradication, of exotic species." *Id.* at p. 4.

and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

 *Id*. "[T]he Organic Act imposes a "conservation mandate" upon on the NPS.

. .." *Greater Yellowstone Coalition v. Kempthorne*, 577 F.Supp.2d 183, 191 (D.

D.C. 2008).   NPS Management Policies (2006) § 1.4.3.   The Organic act also

prohibits uses which impair Park resources.  *Greater Yellowstone Coalition,* 577 at

194.

 Subsequently in 1978, the Congress passed an amendment to the Organic

Act, known as the General Authorities Act, 16 U.S.C. § 1a-1, which has been

recodified at 54 U.S.C. 100101(b)(2), not only reaffirming part (a) above but

further providing:

The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

54 U.S.C. 100101(b)(2).   NPS has construed the "derogation" standard in the

General Authorities Act as a reiteration of the non-impairment standard set forth in

the Organic Act—that is, a duty to prohibit the impairment of the integrity of park

resources and values. NPS Management Policies (2006) § 1.4.2.  *Sierra Club*

*North Star Chapter v. LaHood*, 693 F. Supp.2d 958, 965 (D. Minn. 2010).   Prior

to undertaking any action, NPS must determine "that the activity will not lead to an impairment of park resources and values. "If there would be an impairment, the action may not be approved." NPS Management Policies (2006) § 1.4.7.

## B.  The Wilderness Act.

The Cumberland Island Wilderness Area[5] was designated by Congress on September 8, 1982, under the Wilderness Act, 16 U.S.C. § 1131 *et seq*, creating 8,840 acres of wilderness and 11,718 acres as "potential wilderness" on the island. Pub. L. No. 97-250, § 2(a), 96 Stat. 709.   In establishing the Wilderness Preservation System, Congress through the Wilderness Act seeks to preserve wilderness areas "in their natural condition" for their "use and enjoyment *as wilderness,*" requiring such areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them *unimpaired* for future use and enjoyment *as wilderness*, and so as to provide for the protection of these areas, the preservation of their *wilderness character*.  16 U.S.C. § 1131(a) (emphasis added). The Act promotes the benefits of wilderness "for the American people," especially the "opportunities for a primitive and unconfined type of recreation." *Id.* at § 1131(c). Thus, the statute seeks to provide an opportunity for a primitive wilderness experience as much as to protect the wilderness lands

---

[5] The Cumberland Island Wilderness Area suffers from not having a Wilderness Management Plan to integrate NPS's management of the Wilderness Area with the other Seashore resources and uses.

themselves from physical harm. *See also* National Park Service, *Reference Manual 41* at 14 ("In addition to managing these areas for the preservation of the physical wilderness resources, planning for these areas must ensure that the wilderness character is likewise preserved.")." *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004). *See also High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1197 (11th Cir. 2017) (the clear purpose of the Wilderness Act is "the preservation of untrammeled natural areas," citing *Wilderness Watch,* 375 F.3d at 1091). "[T]he Park Service [is] properly empowered - and indeed obligated - [ ] based on its authority and responsibility to protect the marshlands within Cumberland Island National Seashore as wilderness." *Id*. at 1200.)

There are five qualities of "wilderness character", all equally important in understanding and describing wilderness character and all based on the Wilderness Act's section 2(c), "Definition of Wilderness".  See.  Wilderness Stewardship Plan Handbook: Planning to Preserve Wilderness Character; Wilderness Stewardship Division; Wilderness Stewardship Program, National Park Service, Dept. of Interior, Jan. 2014 (the "Handbook") (http://npshistory.com/publications/wilderness/wilderness-stewardship-plan-handbook-2014.pdf).  These five qualities are: Natural, Untrammeled, Solitude or a Primitive and Unconfined Type of Recreation, Undeveloped, and Other Features of Value.  NPS, through the Handbook, points out for example that when considering

the "Natural" quality of a Wilderness area, the "ecological systems are substantially free from the *effects* of modern civilization. This quality is preserved or improved, for example, by controlling or removing nonindigenous species or restoring ecological processes. This quality is degraded by the loss of indigenous species, occurrence of nonindigenous species . . . ." *Id*. at 5.   The "untrammeled" quality of "wilderness character" is "influenced by any activity or action that intentionally controls or manipulates the components or processes of ecological systems inside wilderness . . .."   *Id*.

## C.  Cumberland Island National Seashore Act.

The Cumberland Island National Seashore was created by Congress in 1972 through the *Cumberland Island National Seashore Act,* 16 U.S.C. § 459i, (the "*Seashore Act*").   Congress mandated that "the seashore shall be permanently preserved in its primitive state" (with an inapplicable exception for certain public recreation activities). 16 U.S.C. § 459i-5(b).   Accordingly, the *General Management Plan for Cumberland Island National Seashore* of *1982,* states that "[f]eral animals *will be removed* where they are detrimental to natural and cultural resources, and they will be transported to the mainland. . .. The feral horse population will be managed to insure a [h]ealthy representative herd. . .." (Emphasis added).

7

**D.  The Endangered Species Act.**

The Supreme Court has called the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185, 98 S.Ct. 2279.

"At the heart of [ ] Congress's plan to preserve endangered and threatened species, is section 7 of the ESA, which places affirmative obligations upon federal agencies. Section 7(a)(1) provides that all federal agencies "shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). *Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008)

The mandate of section 7(a)(2) is even clearer:

Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical . . ..

*Id*. Section 9 of the ESA prohibits the "take" of listed species, "take" being defined to include to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture,

or collect, or to attempt to engage in any such conduct. 16 U.S.C. §1532 (19).   The

term "harm" includes acts that kill or injure protected wildlife by causing

significant modification to habitat and impairment of essential behavioral patterns,

including breeding, feeding, and sheltering. "Harm" can also result from acts that

prevent the recovery of a species by destroying critical habitat and adversely

affecting behavioral patterns essential to the species' survival. 50 C.F.R. §17.3

(2023).

## IV. ARGUMENT

### A. The Court Has Jurisdiction Over Plaintiffs' Administrative Procedure Act (APA) Section 706(2) Claims (Counts I(B), II(B), and III(B)) Because Defendants' "Failure to Act" Is an Affirmative Act.

Defendants ask the Court to dismiss Plaintiffs' Section 706 (2) Claims

(Counts I(B), II(B), and III (B)) because Plaintiffs identify "no agency action" for

the Court to review, yet alone a "final agency action". See Defendants' Brief in

support of motion to dismiss (hereinafter "Brief"), ECF 66-1, pp. 7- 8.

Defendants' motion to dismiss Plaintiffs' APA section 706 (2) claim is

defeated by the recognized principle of law cited in the case upon which the

federal Defendants ("Defendants" unless otherwise specified) heavily rely. In

*National Park Conservation Association v. Norton,* 324 F.3d 1229 (11th Cir.

2003), the 11th Circuit stated, "as a general matter, ... an administrative agency

cannot legitimately evade judicial review forever by continually postponing any consequence-laden action and then challenging federal jurisdiction on 'final agency action' grounds." Id. at 1239, (citing *Cobell v. Norton,* 240 F.3d 1081, 1095 (D.C.Cir.2001)); *In re Mdl–1824 Tri–state Water Rights Litigation*, 644 F.3d 1160, 1182 (11th Cir. 2011). That is precisely the case here.

1. The Defendants' Failure to Act Constitutes an Affirmative Act for Purposes of "Final Agency Action" Review.

"[W]here an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers `final agency action' review." *Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C. Cir. 1987) (explaining that an agency's failure to act when required by law to do so, either by an implicit refusal to act or simply by an unreasonable bureaucratic delay, is reviewable under the APA).

*a.  National Park Service Has a Mandatory Duty to Act to Manage the Feral Horses as to Not Impair the Seashore's Natural and Wildlife Resources and the Wilderness Area.*

The National Park Service has a mandatory, non-discretionary duty to protect the natural resources, wildlife, and wilderness of the Seashore by managing the feral horses to prevent them from free ranging throughout the Seashore.   In creating the National Park System, Congress tasked the National Park Service through the Secretary with the overarching duty to promote and regulate the use of

the Cumberland Island National Seashore as a unit of the National Park System in

a manner that *preserves it unimpaired for the use of future generations*[6].    54

U.S.C. § 100101(a); Promotion and Regulation.  Brief, ECF 66-1 pp. 13, 14 and

15.

      In *Edmonds Institute v. Babbitt*, 42 F.Supp.2d 1 (D.C. Cir. 1999), the Court,

citing a long line of cases, affirmed the NPSOA [National Park Service Organic

Act] and its amendments "reflect a renewed insistence on the part of Congress that

the national parks be managed in accordance with the primary purpose of the

NPSOA, namely the conservation of wildlife." *Id*. at 16.  Not only did the Court

affirm the obligations of NPS under NPSOA but acknowledged these obligations

reached the level necessary for APA review, the Court, citing *Sierra Club v.

Andrus,* 487 F. Supp. 443 (D.D.C.1980) stating "[t]here, as here, the court

recognized that the NPSOA imposed a limited discretion on the Secretary of

Interior, reviewable by the courts.   *Babbitt* at *17.*

      To reiterate, NPS has the duty under the National Park Service Organic Act

and the Seashore Act to conserve the Seashore's natural and wildlife resources "in

---

[6]  While Defendants are willing to admit to NPS's  "responsibility to conserve and provide
enjoyment in a manner that preserves the National Park System for future generations", Brief
ECF 66-1at page 14, Defendants are far less willing to admit to NPS's nondiscretionary duty to
manage the Parks in "such manner and by such means as will leave them unimpaired for the
enjoyment of future generations."   54 U.S.C. 100101(a).

such manner and by such means as will leave them *unimpaired* for the enjoyment of future generations."   Likewise, NPS is charged under the Wilderness Act with preserving, unimpaired, the "wilderness character" of the Cumberland Island Wilderness Area.

*b.  Plaintiffs' Meet the Bennett[7] test for a decision that constitutes a final agency action – NPS's decision to free range (not manage) the horses in violation of the duty to avoid impairment of the Seashore's natural and wilderness resources.*

The APA "creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *Nat'l Res. Defense Council, Inc. v. Sec. & Exch. Comm'n,* 606 F.2d 1031, 1043 (D.C.Cir.1979) ("*NRDC*"). See also. *Abbott Laboratories v Gardner*, 387 U.S. 136, 140, 87 S. Ct. 1507, 1510-11, 18 L.Ed.2d 681 (1967).

"As a general matter," two conditions must be satisfied for an agency action to be deemed "final"[according to *Bennett*]:

First, the action must mark the consummation of the agency's decision making process . . .—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

---

[7]   Citing *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, at 1240 (11th Cir. 2003) Defendants ask the Court to dismiss Plaintiffs' claim for "agency *inaction* under APA § 706(2)" stating "because *Bennett* test for "final agency action" was not satisfied . . .."   Brief, ECF 66-1, p. 10. While Defendants reference the *Bennett* test, they never apply it to the facts of the case.

*Animal Legal Defense Fund v. Veneman*, 469 F.3d 826, 837 (9th Cir. 2006) quoting *Bennett,* 520 U.S. at 177-78, 117 S. Ct. 1154 (1997) (internal quotations omitted).  "Put differently, an agency action is "final" if it is "definitive" and has a "direct and immediate . . . effect on the day-to-day business" of the party challenging or subjected to the action. *Fed. Trade Comm'n v. Standard Oil Co.,* 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (internal quotations omitted)." *Veneman* at 837.

Defendant NPS's refusal to describe its free ranging of the horses as a final agency action is not dispositive of reviewability. *Her Majesty the Queen ex rel. Ontario v. Envtl. Prot. Agency,* 912 F.2d 1525, 1531 (D.C.Cir.1990) (citing *Ciba-Geigy Corp. v. Envtl. Prot. Agency,* 801 F.2d 430, 435 (D.C.Cir.1986)).  Neither does NPS's failure to offer a formal statement explaining the free ranging of the horses deprive that action of finality. *See id.*

Defendant NPS has historically free ranged the horses in the Seashore. (Complaint ECF 49-2, ¶¶ 60-64).   In 1996, NPS initiated a horse management plan for Cumberland to thwart the horses' growing harm to the Island's resources. (Attached hereto as Exhibit A).     Defendant NPS's planning effort was interrupted for one year by Congressional directive.   Currently NPS recognizes "Cumberland has the only herd of feral horses on the Atlantic coast that is not

managed (no food, water, veterinary care, or population control). The herd is affected by all the natural stressors faced by native wildlife."[8]

Plaintiffs' allegations in the complaint meet the factors in *Bennet* for establishing final agency action.   The NPS has failed, and is failing, to manage the horses (failed to act) despite the duties imposed by the NPSOA and the Wilderness Act, i.e., the duties that NPS manage and preserve the Seashore and the Cumberland Wilderness Area so as not to impair same.

First, Defendant NPS has admittedly consummated its decision to free range the horses in the Seashore and to suffer the wild, "affected by all the natural stressors faced by native wildlife" and without supplemental "food, water, veterinary care, or population control".   See footnote 8.   This, the decision to forego active management, is a definitive decision having practical consequences. Second, if NPS were to enact a management plan restricting the horses from free ranging the Seashore (as well as proving the necessary food, water, and vet care) there would certainly be an increase in the condition of the Seashore and Wilderness Area and improved health for the plaintiff horses.  Such a plan would have direct positive consequences on the welfare of the parties to this action ("legal consequences [would] flow", injuries would be redressed).   Conversely, NPS's

---

[8]  See the Cumberland Island National Seashore (CUIS) website:
https://www.nps.gov/cuis/learn/nature/feral-horses.htm

decision to forego a management plan and maintain the status quo results in the continued impairment of the Seashore's natural and wildlife resources and the wilderness character.  In either scenario, the decision regarding the horses has definitive legal consequences.  See. *Veneman* at 840, 841. ("But maintaining the status quo has legal consequences." Citing, the Courts' decision in *Defenders of Wildlife v. Norton,* 258 F.3d 1136 (9th Cir.2001)).   See also. *Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C. Cir. 1987) (explaining that an agency's failure to act when required by law to do so, either by an implicit refusal to act or simply by an unreasonable bureaucratic delay, is reviewable under the APA); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 142 U.S. App.D.C. 74 (D.C. Cir. 1971) (To determine whether a particular agency action is reviewable, "it is necessary to look beyond the mere availability of further administrative proceedings and consider whether the impact of the [action] is sufficiently "final" to warrant review in the context of the particular case"; an agency action which threatens harm to the public interest "might be argued  . . . is more serious and irreparable than private economic injury, which "has always been regarded as sufficient, however, for the purpose of finding an [action] final and reviewable.").

 Conclusion.  Defendants' 50 years of bureaucratic inertia and non-feasance cannot justify their ignoring the statutes, rules, and regulations designed to protect the Cumberland Island National Seashore. The Defendants' management of the horses

of Cumberland by free ranging the horses throughout the entirety of the Seashore is

an affirmative act for purposes of establishing "final agency action" review. For

that reason, the Court should deny Defendants' motion to dismiss Plaintiffs'

Section 706 (2) Claims (Counts I(B), II(B), and III (B)) based on lack of "final

agency action."

## B. SECTION 706 (1) DISCRETE AGENCY ACTION

Defendants seek the dismissal of Plaintiffs' Section 706(1) claims (Counts I

(A), II (A), and III (A)), claiming Plaintiffs failed to satisfy the conditions

established in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55

(2004) requiring plaintiffs assert that the Defendant NPS "as an agency failed to

take a *discrete* agency action that it is *required to take.*" *Id*. at 64.  Because

Plaintiffs have satisfied the two conditions of *SUWA*, Defendants' motion to

dismiss on this basis should be denied.

1. Plaintiffs Appropriately Claim Defendants Took Discrete Agency
   Action.

Defendants argue "the Organic Act does not impose a *discrete*,

nondiscretionary duty on NPS to take *specific* actions at particular sites, much less

to remove the Seashore's feral horses."  Brief, ECF 66-1, p. 13.   The Defendants

are in error.  A review of the Court's analysis in *SUWA* shows Plaintiffs alleged

Defendants failed to take the discrete act of managing the feral horses as to prohibit the horses from running-at-large or free ranging in the Seashore.

An overview of the Supreme Court's analysis in *SUWA* relevant to "discrete agency action" in the context of "failure to act" is required.  The Court started with ""[A]gency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act. (Emphasis added)* "" *Id*. at 62.   "The APA provides relief for a failure to act in § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."" *Id*. The *SUWA* Court concluded: "[t]he final term in the definition, "failure to act," is in our view properly understood as a failure to take an *agency action.*"  Emphasis in the original.   *Id.*

The Court, noted that § 551(13), "[i]n defining "agency action" in terms such as "agency rule, order, license, *sanction [or] relief*" necessarily implied "[a]ll of those categories involve circumscribed, discrete agency actions, as their definitions make clear: . . . *a "prohibition . . . or . . . taking [of] other compulsory or restrictive action" (sanction)*; . . . ."  Emphasis provided.  *Id*. at 62.   The Court further noted "[a] "failure to act" is not the same thing as a "denial." The latter is the agency's act of saying no to a request; the former is simply *the omission of an action* without formally rejecting a request . . .."  Emphasis provided.  *Id.* at 63.

"The important point is that a "failure to act" is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action."  *Id.*

Applying the terms of the APA as interpreted by the Supreme Court in *SUWA*, the Plaintiffs' appropriately claim the Defendant NPS took the requisite "discrete action" when NPS "failed to act" by "omitting" to "take compulsory or restrictive action (sanction)" to manage the horses by restricting the feral horses from running-at-large in the Seashore to the detriment of the Seashore's resources[9].

2. Defendant NPS is Required to Restrict the Feral Horses from Running at Large in Cumberland Island National Seashore to conserve the Seashore's natural, wildlife and wilderness resources.

---

[9] Plaintiffs have phrased this "failure to act" in numerous ways throughout the Complaint including: "Defendants' decision to take no action to manage, care for, or otherwise control the island's feral horses, including the decision to not remove the horses from the island" (Complaint ¶ 87); "failure to remove" (Complaint ¶ 86); "decision not to remove" (Complaint ¶ 83); "failure to comply with" the National Park Service Organic Act and its enabling rules and regulations (Complaint ¶ 89); discrete act of removing (Complaint ¶ 96); "decision not to remove" (Complaint ¶ 98); "inadequate management of the feral horses, including the decision to permit the feral horses to remain on the Island" (Complaint ¶ 103); "discrete act to remove the horses as a non-native species from the Cumberland Island Wilderness" (Complaint ¶ 119); "decision to take no action to manage, care for, or otherwise control" (Complaint ¶ 121); "maintaining' (Complaint ¶ 189); and "free ranging" (Complaint ¶ 198). While not artfully phrased, Plaintiffs contend these various phrases have roughly equivalent meaning and effect; NPS's decision to forego restricting the horses from running at large throughout the Seashore (as compared to direct management of the horses to provide food, water, and shelter in a confined living space whether on the island or elsewhere) is resulting in the impairment of the Seashore's natural, wildlife and wilderness resources in violation of the duty to conserve these resources.

Plaintiffs also satisfy the second element of the *SUWA* criteria: that the agency action be one the agency "is required to take." Defendant NPS is legally bound "by specific statutory mandates that define the Service's mission and impose independent requirements upon the agency." *Greater Yellowstone Coalition v. Kempthorne*, 577 F.Supp.2d 183, 190 (D. D.C. 2008). These statutory and regulatory provisions pertaining to the National Park System, the Cumberland Island National Seashore, and the Cumberland Island Wilderness Area are summarized above in Part III.  It is well established the Congress, in passing the National Park Service Organic Act and its enabling regulations, insisted "that the national parks be managed in accordance with the primary purpose of the NPSOA, namely the conservation of wildlife resources."  *Edmonds Institute v. Babbitt*, 42 F.Supp.2d 1, 16 (D.C. Cir. 1999).  NPS also has the unequivocal duty to not impair the Seashore's natural, wildlife, and wilderness resources.  *Greater Yellowstone Coalition*, 577 at 193.     The cited regulatory provisions creating a specific duty to act are abrogated by Defendants' failure to perform required statutory and regulatory duties, in this case as the result of free ranging horses.  "Whether or not this interpretation can be sustained, it is clearly a question on the merits which should be addressed later — not an appropriate ground for finding that plaintiffs have failed to state a claim." *Edmonds Institute v. Babbitt,* at 16.

3. Plaintiffs Do Not Seek to Dictate How the Objective is Achieved, but Rather, to Assure Defendants Achieve the Mandated Objective: Prevention of horses free ranging to the detriment of the horses and the Seashore's resources.

Defendants argue that even if the Organic Act and its enabling rules and regulations require the preservation of the Seashore in its natural state, the Court is restricted from directing the Defendants as to how they should accomplish that mandate. Brief, ECF 66-1 at 12-16.

To reiterate, Defendants have the non-discretionary duty to conserve the Seashore's natural, wildlife and wilderness resources and to avoid the impairment of Seashore's resources by the island's feral horses by preventing said horses from running at large in the Seashore.  While Plaintiffs have asked the Court to enforce these non-discretionary duties as articulated in *Greater Yellowstone Coalition v. Kempthorne*, 577 F.Supp.2d 183, 190 (D. D.C. 2008) and *Edmonds Institute v. Babbitt*, 42 F.Supp.2d 1, 16 (D.C. Cir. 1999) and reinforced through the cited rules and regulations, specifically the NPS Management Policies (2006),[10] Plaintiffs do

---

[10]  Policy 1.4.4 requires NPS to protect the Seashore's resources and values from impairment "unless directly and specifically provided for by legislation or by the proclamation establishing the park." Policy 4.4.4 states that exotic species will not be allowed to displace native species if such displacement can be prohibited.  Policy 4.4.4.2 addresses management, up to and including eradication, of exotic species. Livestock, such as the horses and the hogs at the Seashore are considered exotic species under Policy 4.4.4.1.

not seek to involve the Court in any unnecessary[11] "judicial entanglement in abstract policy disagreements," as voiced by the Court in *SUWA*.  *SUWA* at 542 U.S. at 66.

Defendants disagree, asserting the Secretary and the NPS have "broad discretion to determine what actions are best calculated to protect resources within the Seashore, and they are not restricted to any single means, such as removal of feral horses."  Brief, ECF 66-1 at 20.  Defendants are mistaken.   While Plaintiffs do seek to stop the horses from free ranging to the harm of the Seashore, they do not ask the Court to instruct NPS "how" the remedial measures are to be implemented – by ordering the NPS to "remove" the horses from island.

The current case is not a case like in *SUWA* and *Audubon of Kan. v. U.S. Dep't of Interior*, 67 F.4th 1093 (10th Cir. 2023), cases cited and relied upon by Defendants, wherein the relevant statutes at issue explicitly charged the administering agencies to balance competing management goals by using their discretion.   *SUWA*, 542 U.S. at 58 ("[I]n passing the FLPMA [Federal Land Policy and Management Act], Congress created "a policy in favor of retaining public lands for multiple use management."  BLM, as the managing agency, seeks to

---

[11] Plaintiffs, including Plaintiff Horses of Cumberland, reserve the right to seek intermediate equitable relief from the Court to remediate the horses' inhumane living conditions on Cumberland Island.

strike "a balance among the many competing uses to which land can be put" through often competing management goals."); *Audubon of Kan.* at 1110 ("In other words, like the statute at issue in *SUWA*, NWRSIA [National Wildlife Refuge System Improvement Act] requires the Service to balance wildlife protection with the competing interests of landowners. *See SUWA*, 542 U.S. at 58, 124 S.Ct. 2373 (citing 43 U.S.C. § 1702(c))."  Here, NPS's duties are clear and discrete.  There exist no amorphous competing interests to balance.

*In re Public Employees for Environmental Responsibility* [PEER], 957 F.3d 267 (D.C. Cir. 2020), involved a challenge to federal agencies' decision to forego producing a management plan under the Air Tour Management Act, which requires that agencies "*shall* establish an air tour management plan . . .." for all non-exempt parks. The agencies argued "completion of a management plan is not a ministerial, clear-cut, or non-discretionary duty" because they must exercise their "discretion" over "the environmental analyses and action [that they] will approve." *Id*. at 273. In upholding the Petitioners' request, the D.C. Circuit Court stated: "Petitioners do not seek to control the content of the plans; they simply seek [ ] to compel the [agencies] to make decisions within the statutory time frames." *Id*.

As the *Peer* Court succinctly recognized, "[the defendants'] argument confuses the *creation* of the plans with their *content*. While the latter may be

discretionary, the former is not." *Id*. at 273. In the current case, the NPS confuses the *result* of conserving the Seashore's resources through controlling the free ranging of the feral horses with *how it would be achieved*. The latter may be discretionary but the former is definitively not.

Conclusion.  Plaintiffs have properly alleged that Defendants have the non-discretionary discrete duty to conserve the Seashore's natural, wildlife and wilderness resources and to avoid the impairment of Seashore resources by the island's feral horses by preventing said horses from running at large in the Seashore.  NPS has failed to perform that duty. Plaintiffs ask the Court to enforce this non-discretionary discrete duty against Defendants, which may be performed without the Court's having to specify the exact way that requirement must be discharged.

## C. STATE LAW CLAIMS AND SOVEREIGN IMMUNITY.

Plaintiffs will move to withdraw their state law claims against the federal Defendants only.

## D. PLAINTIFFS' ENDANGERED SPECIES ACT CLAIMS.

In Defendants' Brief, Part IV d., Defendants challenge whether Plaintiffs have stated a claim for which relief can granted under sections 7 and 9 of the ESA. Neither contention survives close analysis.

    1. Defendants' free ranging Cumberland Island's feral horses has resulted in a "take' in violation of Section 9 of the Endangered Species Act.

    Defendants attack the substance of Plaintiffs' ESA section 9 takings claim by asserting (again) not only that Plaintiffs fail to allege an "affirmative agency action" linking the harm done to the protected loggerhead sea turtle and piping plover with an action by the Defendants but also that Plaintiffs' claim is supported neither by "the ESA's statutory language or the case law."

*a.  Plaintiffs' ESA claims are not subject to the Administrative Procedures Act.*

    Plaintiffs bring their ESA claims pursuant to the ESA Citizen Suit Provision, §1540(g)(1)(A).  The United States Supreme Court has recognized that the ESA Citizen Suit Provision "is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties—both private entities and Government agencies." *Bennett v. Spear,* 520 U.S. 154, 173, 117 S. Ct. 1154, 137 L.Ed.2d 281 (1997). Because ESA's Citizen Suit Provision independently authorizes a right of action, it renders the restrictions of the APA inapplicable to Plaintiffs' ESA claims. *Wash. Toxics Coalition v. E.P.A.,* 413 F.3d 1024, 1029-30 (9th Cir. 2005); *Oregon Natural Desert Ass'n v. Kimbell*, 593 F.Supp.2d 1217, 1220 (D. Or. 2009).   Defendants' suggestion that Plaintiffs must show an "affirmative act" (hinting at requirements of the APA) by Defendants to properly plead a "take" under the ESA is misleading.   Brief, ECF 66-1 at 27.

*b.  Grazing Cattle on federal lands is subject to regulation under the ESA as is Defendants' grazing horses in the Seashore.*

Defendants proclaim ignorance of any instance where a federal agency has been held accountable under the ESA for the "take" of one animal by another. Brief ECF 66-1 at 27.  One must look no further than the multiple cases involving challenges under the ESA to the authorization by federal agencies to graze livestock on federal lands.  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) (Section 7 challenge to BLM's grazing regulations' effects on listed species and their habitat); *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, Case No. 4:13-CV-176-BLW (D. Idaho Jun 26, 2013)(Section 7 and 9 challenge to Forest Service grazing plan's effects on protected bull trout); *Ctr. for Biological Diversity v. Moore*, Civ. 21-733 MIS/GBW (D. N.M. Nov 17, 2023)(Section 7 challenge to Forest Service authorization of cattle grazing authorization on federal lands inhabited by the endangered New Mexico Meadow Jumping Mouse); *Center for Biological Diversity v U.S. Forest Service,* 820 F. Supp. 2d 1029 (D. Ariz. 2011)(Section 7 and 9 challenge to enjoin cattle grazing to prevent harm to the protected Mexican spotted owl and the New Mexico ridge-nosed rattlesnake.); to list but a few.

While Defendants would like to contort Plaintiffs' ESA claim as premised on one animal taking another, the reality is the NPS's free ranging the horses

(grazing) in the Seashore is resulting in "a take" of protected species in direct violation of the ESA.

*c.  Defendant NPS's free ranging feral horses in the Seashore is resulting in a "take" of protected species.*

Plaintiffs allege the Defendants, by allowing the running-at-large and grazing (free ranging) of the feral horses in the Seashore, contrary to the Organic Act and its enabling regulations and orders, is causing the "take" of the protected species to which the Complaint refers. "Take" is defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §1532 (20). "To "take" a species includes to "harm" it. *Id*. § 1532(19). "Harm" is defined to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2006). *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013).

The ESA is intended to conserve endangered species through protecting the broader physical and biological features essential to their recovery, such as the value of a species' critical habitat. This measure is separate and apart from avoiding more direct actions jeopardizing the species. See *N. New Mexico*

*Stockman's Association v. U.S. Fish & Wildlife Service,* 30 F.4th 1210 (10th Cir. 2022).

NPS does not dispute that it has the authority over the Seashore to manage and to control the horses, including their removal if deemed necessary. In fact, NPS has removed the livestock feral cattle completely from the Seashore (**Ruckdeschel Aff. ¶ 6, previously filed at ECF 34-2** ) and is currently managing and removing feral hogs from the Seashore. (Ruckdeschel Aff. ¶ 6, ECF 34-2)[12]. Similarly, NPS has the mandatory duty to remove the feral horses from the Seashore. This duty originates in the Organic Act and the 2006 *NPS Policies*, Section 1.4.  *Greater Yellowstone Coalition*, 577 F.Supp.2d 183 at 193 ("NPS cannot circumvent this limitation [duties of the Organic Act] through conclusory declarations that certain adverse impacts are acceptable, without explaining why those impacts are necessary and appropriate to fulfill the purposes of the park. *See* NPS Policies, § 1.4.3.").

---

[12]  On or about August 17,2023, Cumberland Island National Seashore announced it will increase efforts to reduce the feral swine population this year with $760,000 from the Inflation Reduction Act. https://www.nps.gov/cuis/learn/news/inflation-reduction-act-to-invest-760-000-in-restoration- and-resilience-in-cumberland-island-national-seashore.htm

But for NPS's failure to meet this "mandatory duty to conserve", the illegal "take" of the loggerhead sea turtle and the piping plover would not be occurring and would not be allowed to continue to occur. Causation in this case is neither attenuated nor contrived. "Whether or not this interpretation can be sustained, it is clearly a question on the merits which should be addressed later — not an appropriate ground for finding that plaintiffs have failed to state a claim [under section 9]." *Edmonds Institute v. Babbitt*, 42 F.Supp.2d 1, 16 (D.C. Cir. 1999).

   2. Plaintiffs ESA Section 7 claim is viable as Defendants have continuing authority and management control over the free ranging of Cumberland Island's feral horses.

   Under Section 7 of the ESA, a federal agency has a duty to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2)("Section 706 (a)(2)").   See also. 50 C.F.R. 402.02.   "Action" for purposes of the ESA is defined to include those activities of federal agencies "directly or indirectly causing modifications to the land, water, or air".   50 C.F.R. 402.02.   As detailed above, Defendants' "action" in free ranging feral horses in the Seashore is an action subject to the regulations of the ESA.

"The applicable regulations direct agencies, in considering whether formal consultation is required, "to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). A later portion of the same regulation confirms that agencies must consider the "effects of the action as a whole." *Id.* § 402.14(c). The "[e]ffects of the action" include the "direct and indirect effects of an action on the species or critical habitat," and "[i]ndirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* § 402.02."  *Deer v. Paulison*, 522 F.3d 1133, 1143 (11th Cir. 2008). See also. *Center for Biological Diversity v. U.S. E.P.A.*, 847 F.3d 1075, 1084 (9th Cir. 2017).

In addition to 706 (a) (2), "Section 7(a)(1) of the ESA imposes a separate obligation upon federal agencies and, in relevant part, states that all federal agencies "shall," in consultation with the FWS or National Marine Fisheries Service, "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of [listed species]." 16 U.S.C. § 1536(a)(1)." *Deer v. Paulison*, 522 F.3d 1133, 1145 (11th Cir. 2008).

*a. Arbitrary and Capricious Standard of Review.*

Because the ESA does not establish a standard of review, "the normal 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law' standard applies." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472
(9th Cir. 2011)(citing *Village of False Pass v. Clark,* 733 F.2d 605, 609–10 (9th
Cir.1984)); *see also Tribal Village of Akutan v. Hodel,* 869 F.2d 1185, 1193 (9th
Cir.1988).   "The scope of review under the `arbitrary and capricious' standard is
narrow and a court is not to substitute its judgment for that of the agency.
Nevertheless, the agency must examine the relevant data and articulate a
satisfactory explanation for its action including a rational connection between the
facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State
Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)
(citation and internal quotations omitted).

> Generally, an agency's action is arbitrary and capricious if it
>
> has relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation
> for its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the
> product of agency expertise. The reviewing court should not attempt itself to
> make up for such deficiencies: We may not supply a reasoned basis for the
> agency's action that the agency itself has not given.

*Id.* (citation and internal quotations omitted). Also, a decision is arbitrary and
capricious if the agency "fails to apply the relevant statutory authority in making its
decision." *Sokol v. Kennedy,* 210 F.3d 876, 878 (8th Cir.2000)."   *Sierra Club
North Star Chapter v. LaHood*, 693 F. Supp.2d 958, 970 (D. Minn. 2010).

*b. Defendant NPS's determination the horses are having "no effects" on the Seashore's species or critical habitat is arbitrary and capricious.*

A federal agency fulfills its duty to ensure that its action will not jeopardize a listed species or critical habitat by engaging in consultation with the Fish and Wildlife Service ("FWS") regarding any proposed action that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). The agency's first step in consultation is typically to engage in informal consultation and/or to prepare a biological assessment ("BA"). *Id.* § 402.14(b).

It is sufficiently established the horses of Cumberland are negatively impacting the Seashore, including harming the loggerhead sea turtle and the piping plover, and the habitats upon which they depend.  Complaint 49-2, ¶¶38-44; Aff. Ruckdeschell, ECF 34-2; Aff. Harlan ECF 34-1 ¶¶ 23-26, 31-33;  Mgt Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia, Exh E Complaint, ECF 49-7; See also https://www.nps.gov/cuis/learn/nature/feral-horses.htm; NPS is aware of these adverse effects.

NPS's knowing acceptance of these reasonably certain adverse effects suggest one of two things; NPS has determined the horses' impacts on the protected species or their habitats are of no effect; or NPS has determined to accept and ignore these adverse effects.  In either case, NPS owes the Court an

explanation justifying its "no effects" decision and why it's decision should not be considered in violation of Section 7 and its duty to consult.   50 C.F.R. § 402.14.

*c.  Defendant NPS acted arbitrarily and capriciously in changing its position on managing Cumberland Island's feral horses.*

Without question, federal agencies generally may change their positions on issues.  NPS determined in or about 1995 to initiate a Wild Horse Management Plan and Environmental Assessment (EA) due the impacts of the non-native horses on the natural resources of the island.  See Cumberland Island Wild Horse Management attached hereto as Exhibit A.     Defendants have completely reversed that position without explanation.  NPS's failure to acknowledge NPS's previous position, let alone explain why such a change is justified, is the hallmark of an arbitrary and capricious decision.

""An agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored...." *Greater Boston Television Corp. v.*

*FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) (footnotes omitted), *quoted in State Farm,* 463 U.S. at 57, 103 S.Ct. 2856." *Sierra Club North Star Chapter v. LaHood*, 693 F. Supp.2d 958, 973 (D. Minn. 2010).

NPS provides no explanation to justify their current position of not managing the feral horses neither can it justify this position given its previous position that the horses need to be managed.   NPS must cogently explain this difference in positions.  As climate change increasingly threatens Cumberland Island including the habitats critical to the protected species at issue, the need to manage the horse herd grows even more essential. The NPS must explain its reasons for changing its policy; "the Court cannot provide that basis during APA review: The Court may not accept "counsel's *post hoc* rationalizations for agency action." Id. at 974.

*d. The Defendant NPS's ongoing free ranging of the horses to the impairment of the Seashore and the jeopardizing of its protected species is arbitrary and capricious and a violation of ESA Section 7.*

Defendant NPS has continuing management authority and control over the horses of Cumberland and as such it has a continuing a non-discretionary duty to follow the requirements of the ESA. *Washington Toxics Coalition v. E.P.A.*, 413 F.3d 1024, 1033 (9th Cir. 2005).   Additionally, NPS has the necessary discretionary control to manage the horses in a manner as "to inure to the benefit of

a protected species" in this case the loggerhead sea turtle and the piping plover. *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.,* 340 F.3d 969, 974 (9th Cir.2003).   As argued by Plaintiffs, while NPS is required to manage the horses as to conserve the Seashore's resources, how NPS manages the horses is within the discretionary control of the NPS, subject to the provisions of the ESA.

Here, Defendant NPS has not engaged in the requisite consultation (formal or informal) regarding the free ranging of the horses despite the knowledge its action will affect listed species or critical habitat. "The [agency's] decision to forgo consultation with FWS must be reversed if the [agency] "entirely failed to consider an important aspect of the problem" or "offered an explanation that runs counter to the evidence before the agency." Internal citations omitted.  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). (Cleaned up.).

The Court should enjoin Defendants' action in free ranging the horses as arbitrary and capricious and not in accordance with the ESA.   "Although our review under the arbitrary and capricious standard is deferential, it does not condone a 'clear error of judgment.'"  Id. at 498 (citing *Blue Mountains Biodiversity Project v Blackwood* 161 F.3d 1208, 1216 (9th Cir. 1998) quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989)).

**CONCLUSION**

Here, where the NPS has chosen a course of action in free ranging the Seashore's horses which imperils protected species, the 11th Circuit's observation in *Paulison* at 1147, is noteworthy:   "that while agencies might have discretion in selecting a particular program to conserve — an issue we do not decide here — they must in fact carry out a program to conserve, and not an "insignificant" measure that does not, or is not reasonably likely to, conserve endangered or threatened species."   Likewise, while NPS may have the limited discretion to select a program for how to manage the island's feral horses, they must in fact create and carry out a program to effectively manage the island's feral horses as to conserve the island's protected species.   Plaintiffs respectfully request the Court deny Federal Defendants' motion to dismiss.

*Plaintiffs prepared this submission in accordance with the font and point selections approved in LR 5.1(b).*

Dated this 15th day of April 2024.

[Signatures on following page]

**ATTORNEYS FOR PLAINTIFFS**

**Hal Wright Attorney at Law, LLC**

*/s/Howell Franklin Wright*

Howell Franklin Wright
State Bar of Georgia Number 778109

260 Southview Drive
Athens, GA 30605
(404) 694-7789 hwrightathenslaw@gmail.com

**DuBose Law Group LLC**

*/s/ C. Wilson DuBose*

C. Wilson DuBose
State Bar of Georgia Bar Number 231450

1511 Eatonton Road, Suite 200 Madison, Georgia 30650
(706) 342-7900 *wdubose@duboselawgroup.net*

**CERTIFICATE OF SERVICE**

A copy of this Response was served upon the parties by the Court's electronic filing system.

*/s/ Howell Franklin Wright*
State Bar of Georgia No. 778109