UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HORSES OF CUMBERLAND
ISLAND, et al.,

       Plaintiffs,

     v.

DEB HAALAND, in her official
capacity as Secretary of the
Department of Interior, et al.,

       Defendants.

CIVIL ACTION NO.
1:23-CV-1592-SEG

## O R D E R

This case is about—and brought on behalf of—the horses of Cumberland Island. It is before the Court on Defendants' motions to dismiss Plaintiffs' amended complaint (Doc. 66, 67, 68), and Plaintiffs' emergency motion for equitable relief. (Doc. 83.) After careful consideration, the Court enters the following order.

## I.    Introduction

Plaintiffs are the horses of Cumberland Island and various groups and individuals concerned about equine welfare and environmental conservation. They allege that Cumberland Island's feral horses are suffering from malnutrition and disease, and that the horses' activities harm the native species with whom they cohabitate. Frustrated by government officials'

longstanding failure to manage or care for the horses, Plaintiffs have turned to federal court.  In this lawsuit, Plaintiffs ask the Court to order the National Park Service (the "NPS") and state authorities to remove the feral horses to the mainland or control the horse population in other respects.  They do so in pursuit of two laudable goals: to eliminate the horses' suffering, and to protect fragile ecosystems and native species from harm.  Federal courts, however, are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  That is no less true when the goals pressed by litigants are worthy ones.  After careful study and for the following reasons, the Court concludes that it is not empowered to provide the relief that Plaintiffs seek.

Plaintiffs' claims are brought under the Administrative Procedure Act (the "APA"), the Endangered Species Act (the "ESA"), and several state statutes.  The APA claims cannot succeed because the Plaintiffs fail to identify a final agency action that could be reviewed, or a discrete and legally required duty to remove or manage the feral horses.  As for Plaintiffs' ESA claims, they must be dismissed because Plaintiffs have not pointed to any affirmative act that the NPS has taken which requires formal consultation under the ESA, or any agency action that could have harmed an endangered species.  In fact, according to Plaintiffs' own allegations, the NPS has simply taken *no action* with respect to the feral horses at all—its policy has been one of non-intervention.  Having determined that no federal claim can proceed, the Court

must also decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.

No one wishes to see animals suffer, and Plaintiffs have plausibly argued that the NPS *should* take steps to protect and manage Cumberland Island's feral horse population, not only for the well-being of the horses, but also to preserve the island's ecosystem and its endangered species. While this case must be dismissed, the Court hopes that the important issues Plaintiffs have raised here might spur the NPS or other agencies to act.

## II.   Background

The following facts are derived from the first amended complaint. For purposes of resolving the pending motions to dismiss, the Court accepts the well-pled allegations as true and construes them in the light most favorable to Plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

### A. The Horses of Cumberland Island

A herd of approximately 140 to 170 feral horses roams the beaches and forests of Cumberland Island, a large barrier island off the coast of Georgia. (First Am. Compl., Doc. 54 ¶ 36.) The horses were once domesticated but have returned to the wild, and no longer receive any human support for survival. (*Id.* ¶ 10.) They are not native to Cumberland Island and are considered an invasive or "exotic" species. (*Id.* ¶¶ 10, 37.)

The island's environment has adversely affected the health and well-being of the feral horses. (*Id.* ¶¶ 45, 55-56, 64.) Cumberland Island lacks the food resources necessary to sustain an equine population of any size. (*Id.* ¶ 46.) Native plants on the island, including Spanish moss, smooth cordgrass, and sea oats, provide marginal nutritional value to the horses. (*Id.* ¶ 47.) Some horses also lack access to fresh, clean water. (*Id.* ¶ 53.) As a result of these environmental stressors, the horses suffer from malnutrition and are at risk of dehydration and starvation. (*Id.* ¶¶ 4, 185.) The horse population is in poor health and has an expected lifespan that is approximately one-third of that of domesticated horses. (*Id.* ¶¶ 45, 55-56.)



Figure 1. (Howell-Edwards Aff., Doc. 83-6 at 8)



Figure 2. (Doc. 83-6 at 10)

The feral horse population also negatively impacts Cumberland Island's ecosystem. (*Id.* ¶ 38.)  In particular, the horses threaten the conservation of endangered species on the island, namely, the loggerhead sea turtle and the piping plover. (*Id.* ¶¶ 25, 42, 132-160.)  The "[f]eral horses, by trampling, consuming, and destroying fragile dune vegetation, significantly contribute to dune destabilization, making the primary dune system and [the loggerhead turtle]'s critical nesting habitat more vulnerable to sea level rise, climate change, and extreme weather events." (*Id.* ¶ 146.)  Moreover, the "horses interfere with the essential behavioral patterns of the piping plover, including feeding, roosting, and sheltering in their critical habitat on Cumberland Island, resulting in the harassment and harming of the protected species." (*Id.* ¶ 157.)

## B. Management of Cumberland Island National Seashore

Cumberland Island is managed, and largely owned, by the federal government. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Engineers*, 100 F.4th 1349, 1354 (11th Cir. 2024); *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1188-91 (11th Cir. 2017).  In 1972, Congress created the Cumberland Island National Seashore (the "Seashore") "to provide for public outdoor recreation use and enjoyment" and "to preserve related scenic, scientific, and historical values[.]"  16 U.S.C. § 459i.  The Seashore Act requires that the island be "permanently preserved in its primitive state" and that no

development "shall be undertaken which would be incompatible with the preservation of the unique flora and fauna or the physiographic conditions [then] prevailing[.]" *Id.* § 459i-5. The Seashore is administered by the NPS, an agency of the Department of the Interior. *Id.* The State of Georgia also maintains concurrent law enforcement jurisdiction and the right to tax non-federal property within the Seashore's boundaries. *Id.* § 459i-6.

In 1995, the NPS began considering management options for the feral horses of Cumberland Island. (*Id.* ¶ 44.) Before the NPS could implement a plan to manage the feral horse population, however, Congress intervened. (*Id.* ¶ 60.) A federal appropriations rider "directed the NPS to immediately terminate any actions to manage or control the island's horses for the remainder of the fiscal year ending in 1997." (*Id.* ¶ 61.) Since then, the NPS has not actively managed the horse population on Cumberland Island. (*Id.* ¶ 59.)

## C. The Parties

Plaintiffs are the horses of Cumberland Island, the Georgia Equine Rescue League, the Georgia Horse Council, as well as three individuals, namely, Susan Gregory, Carol Ruckdeschel, and Will Harlan. (*Id.* ¶¶ 10-22.)

The horses of Cumberland Island are an unmanaged herd of feral horses that live on the island.[1]  Plaintiffs allege that they are suffering from inadequate access to food and water, and require veterinary care.  (*Id.* ¶¶ 45-59.)

The Georgia Equine Rescue League (the "GERL") "is a 501(c)(3) non-profit organization of 400 members with a mission of helping horses in need of care and protection by finding solutions to the growing problem of starved, abused, and neglected equine in the state of Georgia."  (Doc. 54 ¶ 11.)  It "works through education, creating incentive programs for equine health, and working with the Georgia Department of Agriculture Equine Division and other law enforcement entities to reduce abuse and neglect of horses in Georgia."  (*Id.*)

The GERL's members include Plaintiff Susan Gregory, "who has visited Cumberland Island and has extensively studied the condition of the horses of Cumberland."  (*Id.* ¶ 13.)  "She has found the horses at Cumberland to be a particular challenge to her overall work as a member of the GERL in bringing assistance to the state's abused and neglected horses."  (*Id.*)  Moreover, "[w]itnessing the inhumane condition of the horses at Cumberland Island has had an immediate adverse impact on Ms. Gregory's aesthetic enjoyment of not

---

[1] *See Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1234, 1258 (11th Cir. 1998) (accepting that the loggerhead sea turtle and green sea turtle, along with two individuals, collectively had standing to sue under the ESA).

only seeing healthy horses, but also of experiencing the natural wonders of Cumberland Island." (*Id.*)

The Georgia Horse Council (the "Council") "is a non-profit organization dedicated to promoting, educating, and unifying equine-interested persons, state horse organizations and state breed associations in Georgia." (*Id.* ¶ 16.) "The Council works diligently to meet the needs of its members by offering a variety of events and opportunities to advance Georgia's horse industry." (*Id.*) Its "members derive aesthetic pleasure from seeing healthy and thriving horses living under humane conditions."

Plaintiff Carol Ruckdeschel is a resident of Cumberland Island. (*Id.* ¶ 17.) "She has spent her adult life studying and documenting the various natural systems, communities and species that define Cumberland Island, especially the protected species of the loggerhead sea turtle and the piping plover." (*Id.*) As "a long-standing advocate for the island's natural systems and biota[,] . . . Ms. Ruckdeschel's aesthetic pleasure is diminished by the adverse impacts on the horses as well as the island's ecosystems, especially the species such as the loggerhead sea turtle and the piping plover . . . ." (*Id.*)

Plaintiff Will Harlan "is a senior scientist and Southeast Director at the Center for Biological Diversity." (*Id.* ¶ 20.) His book *Untamed: The Wildest Woman in America and the Fight for Cumberland Island* was a bestseller and winner of environmental awards. (*Id.*) "Harlan spent 19 years of his life

writing the book and studying Cumberland Island." (*Id.*)  He also "derives aesthetic pleasure from seeing healthy and thriving ecosystems on the island and from observing native, rare, and imperiled species thriving within those ecosystems especially the protected species of the loggerhead sea turtle and the piping plover." (*Id.*)

Defendants are various federal and state officials, sued in their official capacities.  (*Id.* ¶¶ 30-35.)

Deb Haaland is sued in her official capacity as Secretary of the Interior. (*Id.* ¶ 30.)  As Secretary, Haaland is responsible for complying with requirements of the Administrative Procedure Act, the Cumberland Island National Seashore Act, the Endangered Species Act, and the Wilderness Act. (*Id.*)

Mark Foust is sued in his official capacity as the Director of the South Atlantic-Gulf Region for the NPS. (*Id.* ¶ 31.) "As Regional Director, Defendant Foust is responsible for managing use, interpretation, protection, maintenance, and environmental quality programs within the region's National Parks, including the Cumberland Island National Seashore and Cumberland Wilderness." (*Id.*)

Gary Ingram is sued in his official capacity as Superintendent of the Seashore.  (*Id.* ¶ 32.) As Superintendent, Defendant Ingram is responsible for supervising the activities of the NPS at the Seashore.  (*Id.*)

Walter Rabon is sued in his official capacity as Interim Commissioner of the Georgia Department of Natural Resources. (*Id.* ¶ 34.) "As Interim Commissioner, Defendant Rabon is responsible for protecting the state's natural resources, including its fish, wildlife, and coastal resources." (*Id.*)

Tyler Harper is sued in his official capacity as Commissioner of the Georgia Department of Agriculture. (*Id.* ¶ 35.) As Commissioner, "Defendant Harper is responsible for assuring that the state's equine population is treated humanely by their individual owners . . . and is protected from disease . . . ." (*Id.*) He has "broad authority and control over the state's equine population, including the authority to remove equines when necessary to protect the state's equine population." (*Id.*)

For the sake of brevity, the Court will often refer collectively to Defendants Halland, Foust, and Ingram as the "federal Defendants," or the "NPS."[2]

### D. Procedural History

Plaintiffs filed this case on March 12, 2023, seeking declaratory and injunctive relief relating to Defendants' alleged failure to properly manage

---

[2] *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (A suit against a government official in her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent," such that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")

Cumberland Island's feral horse population. (Doc. 1.) The Defendants filed several motions to dismiss. (Doc. 13, 28, 35.) The Court held oral argument on Defendants' motions to dismiss on December 19, 2023. (Doc. 42.) On the eve of oral argument, Plaintiffs moved for leave to amend their complaint. (Doc. 41.) After oral argument, Plaintiffs filed an amended motion for leave to amend their complaint, which Plaintiffs intended to supersede their earlier-filed motion for leave to amend. (Doc. 49.) The Court granted Plaintiffs' amended motion for leave to amend the complaint. (Doc. 53.) The operative pleading in this matter is the first amended complaint. (Doc. 54.)

Defendants have now filed motions to dismiss the first amended complaint. (Doc. 66, 67, 68.) The motions to dismiss have been fully briefed. (Doc. 71, 72, 73, 77, 78, 79.) After the motions were briefed, Plaintiffs clarified and withdrew certain claims from their first amended complaint. (Doc. 80.) They also voluntarily dismissed the State of Georgia as a Defendant in this suit. (Doc. 82.)

Plaintiffs filed an emergency motion for equitable relief on August 23, 2024, seeking an injunction compelling Defendants to provide water and food to Cumberland Island's feral horse population. (Doc. 83.) The emergency motion has been fully briefed. (Doc. 84, 85, 86, 87.)

### III.   Legal Standard

Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Rule 12(b)(1) allows for dismissal of a case when the court "lack[s] . . . subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2002). A Rule 12(b)(1) motion may present either a facial or a factual attack on the complaint. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Here, Defendants bring a facial attack. Such motions are based on the allegations of jurisdiction in the complaint, and the court accepts the allegations in the complaint as true. *Id.* at 1529.

Rule 12(b)(6) provides for dismissal of a case when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

13

*Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (citing *Twombly*, 550 U.S. at 557).  The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

## IV.   Discussion

Plaintiffs bring seven causes of action against the Defendants.  Counts I, II, and III assert Administrative Procedure Act ("APA") claims under the Organic Act (Count I), the Seashore Act (Count II), and the Wilderness Act (Count III) against the federal Defendants.  Count IV asserts violations of the Endangered Species Act (the "ESA") against all Defendants.  Counts V, VI, and VII assert state law claims, including violation of the Humane Care for Equines Act, O.C.G.A. §14-3-1, *et seq.,* against all Defendants.

The Court will first consider Plaintiffs' APA claims, and then turn to their ESA and state law claims.

14

### A. Administrative Procedure Act Claims

The APA enables judicial review of an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis added). There are two paths to judicial relief under the APA. APA § 706(1) authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed," that is, it enables a court to remedy a *failure to act*. 5 U.S.C. § 706(1). APA § 706(2) empowers courts to hold final agency actions unlawful on six enumerated grounds, including, as relevant here: for being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (commonly referred to as arbitrary and capricious review). 5 U.S.C. § 706(2).

This case involves both § 706(1) and § 706(2) claims. The court will examine them out of order, turning first to Plaintiffs' § 706(2) claims and then their § 706(1) claims.

### 1. APA § 706(2) Claims

Federal courts only have jurisdiction to review "final agency action" under APA § 706(2). 5 U.S.C. § 704; *Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 877 (11th Cir. 2009) ("If [a] claim attacks an agency's action, instead of its failure to act, and the statute allegedly violated does not provide

15

a private right of action, then the 'agency action' must also be a 'final agency action.'"); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) ("[F]ederal jurisdiction is . . . lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704."). To qualify as "final" agency action for which § 706(2) review is available, agency action must satisfy two requirements: "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

Plaintiffs assert that the federal Defendants have abdicated their duties under various federal statutes by failing to remove or otherwise manage the Seashore's feral horse population. According to Plaintiffs, the NPS's failure to manage, care for, or remove the feral horses is unlawful because those actions are required by the Organic Act, 54 U.S.C. § 100101, *et seq.* (Count I), the Seashore Act, 16 U.S.C. § 459i, *et seq.* (Count II), and the Wilderness Act, 16 U.S.C. § 1131, *et seq.* (Count III).

As the NPS points out, however, Plaintiffs have failed to identify any *final agency action* which this Court could review. Plaintiffs' complaints lie

16

with agency *inaction*, that is, the NPS's failure to remove the feral horses, or provide them food, water, and veterinary services.  Specifically, Plaintiffs take issue with NPS's "decision to take no action to manage, care for, or otherwise control the island's feral horses, including the decision to not remove the horses from the island[.]"  (Doc. 54 ¶¶ 87, 121.)  They contend that "NPS's failure to affirmatively act to remove Cumberland's horses as a non-native exotic species and livestock . . . is arbitrary and capricious[.]"  (*Id.* at 34, 39, 45.)

While Plaintiffs style NPS's inaction as a "decision," there is no final agency action to "hold unlawful and set aside" because the NPS has *not acted at all*.  It has merely maintained the longstanding status quo by not interfering with Cumberland's Island pre-existing feral horse population.[3]  5 U.S.C. § 706(2); *see, e.g., Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census*, 945 F.3d 183, 190 (4th Cir. 2019) (observing that although the plaintiffs' APA claims were "styled" as seeking "to 'set aside agency action' under Section 706(2)," they asserted "that the Census Bureau *[was] not doing enough* to ensure an accurate . . . 2020 Census," and were therefore better

---

[3] The Court takes judicial notice of the fact that the horses were feral before Congress established the Seashore because it is a matter of public record that "is generally known within the trial court's territorial jurisdiction."  Fed. R. Evid. 201(b)(1); *Universal Express, Inc. v. U.S. Sec. & Exch. Comm'n*, 177 Fed.Appx. 52, 53 (11th Cir. 2006) ("Public records are among the permissible facts that a district court may consider."); *see also Cumberland Island: Feral Horses*, Nat'l Park Serv., https://www.nps.gov/cuis/learn/nature/feral-horses.htm (last accessed Oct. 18, 2024).

analyzed under section 706(1) (emphasis added)); *Watkins v. Sec. & Exch. Comm'n*, No. 1:15-CV-3716-SCJ, 2017 WL 11696404, at *3 (N.D. Ga. Jan. 23, 2017) ("[Plaintiffs'] allegation, however, does not allege any 'final agency action' that could be subject to review, only that the SEC 'knew' something and *did not act* on that alleged knowledge."); *Mashni v. U.S. Army Corps of Engineers*, 535 F. Supp. 3d 475, 484 (D.S.C. 2021) ("[N]othing authorizes the court to conduct judicial review in the absence of an agency decision."); *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1309 (S.D. Cal. 2018) ("Section 706(2) is typically reserved for *completed agency actions* whose validity can be assessed according to the bases for setting aside agency action . . . ." (emphasis added)).

While there are circumstances where *inaction* can itself qualify as a final agency action susceptible of § 706(2) review, a plaintiff in such a case must still demonstrate that the decision not to act "mark[ed] the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Put differently, where "administrative inaction has the same impact on the rights of the parties as an express denial of relief," then that inaction can be reviewed on § 706(2) grounds. *Her Majesty the Queen in Right of Ont. v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). For instance, the D.C. Circuit held that an EPA letter "confirm[ing] a definitive position" on a rulemaking petition represented a "final agency action that the agency ha[d] not frankly

18

acknowledged," even though the EPA had failed to formally grant or deny the petition. *Id.* at 1531-32 (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)). Another case concluded that the EPA's failure to veto a construction permit, albeit a form of inaction, was a "consummated" agency action for § 706(2) purposes.[4] *All. to Save Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 9 (D.D.C. 2007).

Here, Plaintiffs do not plausibly allege a failure to act that marks the "consummation" of any NPS decisionmaking process akin to a rulemaking procedure, as in *Her Majesty*, or a construction permitting process, as in *Mattaponi*. The only potential process that Plaintiffs identify is a horse management planning effort in the mid-1990s. (Pl. Opp., Doc. 73 at 13-14.) They allege that "[b]eginning in 1995, the NPS began to consider alternative means for managing the Island's horse population." (Doc. 54 ¶ 60.) This effort was cut short in 1996, however, when "Congressman Kingston successfully attached a 'rider' to an unrelated federal appropriations bill directing the NPS to immediately terminate any actions to manage or control the island's horses for the remainder of the fiscal year ending in 1997." (*Id.* ¶ 61.) Based on these allegations and an NPS webpage noting that the Cumberland horses are "not

---

[4] This makes good sense because the *failure to veto* a permit is conceptually equivalent to *approval* of the permit, which would undoubtedly qualify as a final agency action.

managed," Plaintiffs argue that the NPS "consummated its decision to free range the horses in the Seashore[.]" (Doc. 73 at 14.)

None of Plaintiffs' assertions about the NPS's efforts to "consider alternative means for managing" the horse population plausibly allege a concrete final agency denial or action based on the consummation of a NPS decisionmaking process. (Doc. 54 ¶ 60.) That the NPS has considered managing the horses at some point, without more, does not suggest inaction that "has the same impact on the rights of the parties as an express denial of relief[.]" *Her Majesty*, 912 F.2d at 1531.

Even if the 1996 termination of horse management efforts did qualify as a final agency action, Plaintiffs' allegations effectively concede that the NPS did not act in an arbitrary and capricious manner. Given that Congress instructed "the NPS to immediately terminate any actions to manage or control the island's horses for the remainder of the fiscal year ending in 1997," the NPS had no choice but to obey that directive. (Doc. 54 ¶ 61.) "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), *overruled on other grounds by*, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024)). Because the NPS followed Congress's mandate by

halting its 1990s planning process for managing the horses, it did not act arbitrarily or capriciously.

In sum, Plaintiffs have failed to identify any final agency action that could give rise to a § 706(2) claim in Counts I, II, and III.  As such, this Court lacks jurisdiction over those claims.  *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d at 1236 ("[F]ederal jurisdiction is . . . lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704.").  Moreover, even if the closure of the 1990s horse management planning process constituted a final agency action, Plaintiffs have failed to state a claim because that termination was directed by Congress, and thus was not arbitrary and capricious within the meaning of § 706(2).

## 2. APA § 706(1) Claims

"[F]ailures to act are sometimes remediable under the APA, but not always."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004); *Hasan v. Wolf*, 550 F. Supp. 3d 1342, 1345 (N.D. Ga. 2021).  Section 706(1) of the APA authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); *Fanin*, 572 F.3d at 877-78.  A court's ability to "compel agency action" is circumscribed to cases where an agency has ignored a specific, unequivocal command.  In its seminal case interpreting § 706(1), *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), the U.S. Supreme Court held that a claim under § 706(1) may "proceed only where a

plaintiff asserts that an agency failed to take a *discrete agency action* that it is *required to take*." 542 U.S. at 64 (emphasis added). These two limitations— (1) discrete agency action, that is (2) legally required—prevent "broad programmatic attack[s]" on agencies and "rule[ ] out judicial direction of even discrete agency action that is not demanded by law . . . ." *Id.*

Section 706(1), moreover, "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* Courts do not have the authority to "enter general orders compelling compliance with broad statutory mandates." *Id.* at 66. In an ominous coincidence for the Plaintiffs in this case, *SUWA* specifically cited the hypothetical of a plaintiff challenging the Secretary of the Interior's failure to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," as an improper § 706(1) claim that would "inject[ ] the judge into day-to-day agency management." *Id.* at 66-67.

The plaintiffs in *SUWA* argued that the Bureau of Land Management (the "BLM") "failed to comply with certain provisions in its land use plans," related to off-road vehicle use. *Id.* at 67. *SUWA* found that those land use provisions were legally unenforceable under § 706(1), explaining that "[q]uite unlike a specific statutory command . . . , a land use plan is generally *a statement of priorities*; it guides and constrains actions, but does not (at least

in the usual case) prescribe them." *Id.* at 71 (emphasis added). Thus, "absent clear indication of binding commitment," "a statement in a plan that [the] BLM 'will' take this, that, or the other action," cannot be compelled under the APA. *Id.* at 69. Indeed, "[i]t would be unreasonable to think that either Congress or the agency intended otherwise, since land use plans nationwide would commit the agency to actions far in the future, for which funds have not yet been appropriated." *Id.* at 71. Enabling "general enforcement of plan terms would lead to pervasive interference with [the] BLM's own ordering of priorities . . . [and] would ultimately operate to the detriment of sound environmental management." *Id.* at 71-72.

The Plaintiffs here point to a smorgasbord of statutory provisions, agency management plans, regulations, policies, and orders they claim give rise to a discrete and legally required duty on the NPS to manage Cumberland Island's feral horses. These include (1) statutory mandates in the Organic Act, 54 U.S.C. § 100101, the Seashore Act, 16 U.S.C. § 459i, and the Wilderness Act, 16 U.S.C. § 1131; (2) the 2006 NPS Management Policies; (3) Executive Orders 13112 and 13751; (4) regulations 50 C.F.R. § 30.11 and 36 C.F.R. § 2.60; (5) the 1984 General Management Plan for Cumberland Island National Seashore; (6) the 1990 Statement for Management for Cumberland Island National Seashore; and (7) NPS Director's Order #41: Wilderness Stewardship. The Court will address each in turn.

23

### a. Statutory Mandates in the Organic Act, Seashore Act, and Wilderness Act

Plaintiffs allege that the federal Defendants' failure to manage the horses of Cumberland Island contravenes the broad statutory objectives at the heart of the Organic Act (Doc. 54 ¶¶ 66-67), the Seashore Act (*id.* ¶¶ 90, 97), and the Wilderness Act (*id.* ¶¶ 106-15).   None of these broad statutory objectives, however, compel a *discrete* legal duty that could sustain a § 706(1) claim.

Because Cumberland Island is part of the National Park System, its administration is subject to the Organic Act of 1916.  54 U.S.C. § 100101.  The Organic Act directs the NPS to

> promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a).   The Seashore Act, which created the Cumberland Island National Seashore, mandates that "the seashore shall be permanently preserved in its primitive state . . . ."  16 U.S.C. § 459i-5(b).  Large swathes of Cumberland Island are also designated as wilderness areas, governed by the Wilderness Act.  16 U.S.C. § 1131; (Doc. 54 ¶ 107).  Wilderness areas are to be "administered  for  the  use  and  enjoyment  of  the  American  people  in  such

manner as will leave them unimpaired for future use and enjoyment as wilderness," and preserved "in their natural condition[.]" 16 U.S.C. § 1131(a).

These three statutory objectives are precisely the kind of "broad statutory mandates" that do not state a discrete legal duty under APA § 706(1). *SUWA*, 542 U.S. at 66-67 (explaining that courts do not have the authority to "enter general orders compelling compliance with broad statutory mandates"). Although these statutory provisions are "mandatory as to the object[ives] to be achieved," they leave the NPS "a great deal of discretion in deciding how to achieve [those goals]." *Id.* at 66-67. They certainly do not "mandate, with the clarity necessary to support judicial action under § 706(1)," that the NPS remove the feral horse population from Cumberland Island, or otherwise manage the horses in any particular manner. *Id.*

Indeed, if the Court were to attempt "to determine whether compliance was achieved" with these statutory objectives, *id.* at 66, it would have to decide which managerial actions regarding the horses—for example, partial or wholesale removal, supplemental feeding, fertility control, or any other action—would best "conserve the scenery, natural and historic objects, and wild life" under the Organic Act, 54 U.S.C. § 100101(a), or best preserve the Seashore "in its primitive state" under the Seashore Act, 16 U.S.C. § 459i-5(b). Not only does the Court lack the expertise to resolve those questions, but engaging in such an inquiry would undoubtedly "inject[ ] the [Court] into day-

to-day agency management[,]" contravening the Supreme Court's instructions in *SUWA*.  542 U.S. at 66-67; *see also Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 875 (10th Cir. 2019) ("We are not experts in the field of habitat management and preservation and surely have no business attempting to instruct the [Forest Service] how best to achieve § 251.23's objective [to conserve certain areas].")

After *SUWA*, courts that have considered statutory provisions—identical or analogous to those cited by Plaintiffs—have also concluded that they do not describe a *discrete* legal duty.  Examining the same conservation mandate in the Organic Act that Plaintiffs rely on, the U.S. District Court for the District of Columbia reasoned that because the NPS has "considerable discretion" to implement the Organic Act's objective, "without more, that statutory command would be unlikely to create any specific commitments to act."  *Nat'l Parks Conservation Ass'n v. United States Dep't of the Interior*, No. CV 20-3706 (RC), 2024 WL 1344450, at *17 (D.D.C. Mar. 29, 2024), *appeal dismissed*, No. 24-5147, 2024 WL 4294879 (D.C. Cir. Sept. 25, 2024); *see also Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 46 F. Supp. 3d 1254, 1283 (M.D. Fla. 2014), *aff'd*, 835 F.3d 1377 (11th Cir. 2016) (rejecting plaintiffs' argument that "every NPS decision" under the Organic Act "must favor preservation if there is a conflict with another goal").  Similarly, the Tenth Circuit found that a Forest Service regulation directing that "Research Natural Areas will be

26

retained in a virgin or unmodified condition[,] . . . leaves entirely to the [Forest Service] the decision of how best to achieve this objective[,]" and thus "simply does not call for a discrete action." *Utah Native Plant*, 923 F.3d at 874-75.

The statutory provisions at issue here—to "conserve the scenery, natural and historic objects, and wild life," 54 U.S.C. § 100101(a); to preserve the Seashore "in its primitive state," 16 U.S.C. § 459i-5(b); and to preserve wilderness areas "in their natural condition," 16 U.S.C. § 1131(a)—furnish wide discretion to the NPS to balance competing ecological factors in pursuit of an overall conservation objective.  Contrary to Plaintiffs' argument, these broad statutory mandates do not require a discrete agency action, such as removing the feral horse population, and cannot support a § 706(1) claim.

### b. 2006 NPS Management Policies

Plaintiffs allege that, by failing to remove or manage the horses on Cumberland Island, the NPS has violated its own policies regarding invasive species.  (Doc. 54 ¶¶ 68-70, 86.)  The 2006 NPS Management Policies ("Management Policies") address several substantive areas of internal NPS management, including the treatment of "exotic species."[5]  "Exotic species" are

---

[5] The 2006 NPS Management Policies are available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf (last accessed Oct. 18, 2024).  On a motion to dismiss, courts may consider "documents incorporated into the complaint by reference[.]"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A document is "incorporated by reference" if the document is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its

defined as those "that occupy or could occupy park lands directly or indirectly as the result of deliberate or accidental human activities[,]" and are commonly referred to as "nonnative, alien, or invasive species." Management Policies § 4.4.1.3. The Management Policies provide that: "All exotic plants and animal species that are not maintained to meet an identified park purpose will be managed—up to and including eradication—if (1) control is prudent and feasible," and (2) the exotic species meets certain criteria, such as interfering with native species. *Id.* § 4.4.4.2. They also specify that "[h]igh priority will be given to managing exotic species that have, or potentially could have, a substantial impact on park resources, and that can reasonably be expected to be successfully controlled." *Id.* § 4.4.4.2.

The Management Policies do not state a discrete legal duty to remove feral horses from Cumberland Island because they expressly reserve discretion on the management of invasive species; that is, exotic species will be managed only where the agency believes such "control is *prudent and feasible*[.]" *Id.* § 4.4.4.2.11 (emphasis added); *see Utah Native Plant*, 923 F.3d at 874 (concluding that a Forest Service Manual provision that called for the agency

---

authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). Both requirements are met here, as (1) the Management Policies provide the basis for one of Plaintiffs' § 706(1) claims, and (2) the parties do not dispute the authenticity of the Management Policies, to which Plaintiffs' amended complaint expressly refers. (Doc. 54 ¶¶ 68-70, 73.)

to "[r]emove exotic plants or animals [from an RNA] *to the extent practicable*"
did not sustain a discrete legal duty).

But even if the Management Policies called for a discrete agency action,
as a manual of internal guidance, the Management Policies do not state a
*legally required* duty.  *See The Wilderness Society v. Norton,* 434 F.3d 584, 596
(D.C. Cir. 2006) (finding that the 2001 NPS Management Policies constituted
"a nonbinding, internal agency manual intended to guide and inform Park
Service managers and staff," and were not "judicially enforceable at the behest
of members of the public who question the agency's management"); *River
Runners for Wilderness v. Martin,* 593 F.3d 1064, 1070-73 (9th Cir. 2010)
(explaining that "the 2001 Policies are not enforceable against the Park
Service" because they "do not prescribe substantive rules").

Although "the text of the [Management Policies] on occasion uses
mandatory language, such as 'will' and 'must,' . . . "[i]t lacks precision in its
directives, and there is no indication of how the enunciated policies are to be
prioritized."  *The Wilderness Soc.*, 434 F.3d at 595.  Moreover, the NPS
expressly intended the Management Policies to be nonbinding:

> The policies contained within this document are intended only to
> improve the internal management of the National Park Service; they are
> not intended to, and do not, create any right or benefit, substantive or
> procedural, enforceable at law or equity by a party against the United
> States, its departments, agencies, instrumentalities or entities, its
> officers or employees, or any other person.

Management Policies at 4.  As such, the Management Policies lack the "clear indication of binding commitment" required to sustain a § 706(1) claim based on an internal agency document.  *SUWA*, 542 U.S. at 69.  Holding otherwise "would chill efforts by top agency officials to gain control over their bureaucratic charges through internal directives."  *The Wilderness Soc.*, 434 F.3d at 596.

### c. Executive Orders 13112 & 13751

Like the Management Policies, the Executive Orders upon which Plaintiffs rely do not state discrete, legally required duties that are enforceable under § 706(1) of the APA.  Executive Order 13751, which amends Executive Order 13112, states that federal agencies "shall, *to the extent practicable*" and "*subject to the availability of appropriations, and within administrative, budgetary, and jurisdictional limits*, use relevant agency programs and authorities to . . . eradicate or control populations of invasive species . . . ."  E.O. 13751 at 2 (emphasis added).

The Executive Order does not call for any *discrete* agency action because it expressly reserves agency discretion through qualifying language—namely, directing eradication and control of invasive species "to the extent practicable" and "subject to the availability of appropriations."  *Id.*  While it certainly specifies a mandatory objective that agencies are to pursue, the Order deliberately leaves a great deal of discretion on *how* to achieve that goal.  S*ee*

30

*Utah Native Plant*, 923 F.3d at 874.  It also appears to recognize that agencies will have to prioritize between different eradication and control efforts, "subject to the availability of appropriations."

Moreover, the Executive Order does not state a *legally required* duty under Section 706(1).  Executive orders "are [rarely] judicially enforceable in private civil suits." *In re Surface Mining Regulation Litig.*, 627 F.2d 1346, 1357 (D.C. Cir. 1980); *see also Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review.").  Judicial review of an executive order is only available "when (1) the Executive Order has a 'specific statutory foundation,' (2) the statute and the Executive Order do not preclude judicial review, and (3) there is an objective standard by which the court can judge the agency's actions." *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 (11th Cir. 2021) (citing *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 913 (10th Cir. 2004) and *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997)).

While Executive Order 13751 is arguably based on a statutory foundation, E.O. 13751 at 1, it expressly precludes judicial review.  Just like the Management Policies, the Order specifically declares that it is "not intended to, and does not, create any right or benefit, substantive or

31

procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." E.O. 13751 at 6. *See, e.g.*, *Nat'l Mining Ass'n*, 985 F.3d at 1327 (concluding that an executive order's disclaimer that it does not "create any right or benefit, substantive or procedural, enforceable by any party" precludes judicial review); *Pars v. Cent. Intel. Agency*, 295 F. Supp. 3d 1, 5 (D.D.C. 2018) (finding that an executive order containing a similar disclaimer could not give rise to a § 706(1) claim); *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 176 F. Supp. 3d 839, 848 (D. Minn. 2016), *amended*, No. CV 13-2262 (JRT/LIB), 2017 WL 740994 (D. Minn. Feb. 24, 2017) (holding, based on a similar disclaimer, that "[t]he President could not have been more explicit that he did not intend for E.O. 11988 to create an enforceable legal framework"). That disclaimer makes plain that the Executive Orders do not state legally enforceable duties and thus, cannot sustain Plaintiffs' § 706(1) claims.

### d. 50 C.F.R. § 30.11 and 36 C.F.R. § 2.60

The Plaintiffs cite two regulations that they claim give rise to a discrete legal duty to remove and otherwise manage Cumberland Island's horse population. 50 C.F.R. § 30.11 states that "[f]eral animals, including horses . . . without ownership that have reverted to the wild from a domestic state may be taken by authorized Federal or State personnel or by private persons

operating under permit." 50 C.F.R. § 30.11(a) (2024).  But this regulation only "govern[s] general administration of units of the *National Wildlife Refuge System*," by the U.S. Fish and Wildlife Service, and therefore is inapplicable to Cumberland Island, which is a unit of the *National Park System*.  *Id.* § 25.11 (emphasis added).  In addition, the regulation does not state any legally required duty with which Defendants must comply.

As for 36 C.F.R. § 2.60, it is a *criminal* regulation that prohibits "[t]he running-at-large, herding, driving across, allowing on, pasturing or grazing of *livestock* of any kind in a park area or the use of a park area for agricultural purposes."  36 C.F.R. § 2.60(a) (2024) (emphasis added); *see id.* § 1.3(a) ("A person convicted of violating a provision of the regulations contained in parts 1 through 7, part 9 subpart B, and parts 12 and 13 of this chapter shall be subject to the criminal penalties provided under 18 U.S.C. [§] 1865.").  Under the regulation, "[L]ivestock" that is found "trespassing in a park area *may* be impounded by the superintendent and, if not claimed by the owner . . . , shall be disposed of in accordance with applicable Federal and state law."  *Id.* § 2.60(c)(1) (emphasis added).

There are two reasons why this criminal regulation cannot serve as the basis for Plaintiffs' § 706(1) claim.  First, 36 C.F.R. § 2.60 does not provide a definition of "livestock," and *feral* horses are not "livestock" under the ordinary meaning of that term.  Merriam-Webster's Dictionary defines "livestock" as

"animals kept or raised for use or pleasure."[6]  The Oxford English Dictionary definition is similar: "Domestic animals kept on a farm for use or profit."[7]  And Black's Law Dictionary defines "livestock" as "[f]arm animals; specif., domestic animals and fowls that (1) are kept for profit or pleasure, (2) can normally be confined within boundaries without seriously impairing their utility, and (3) do not normally intrude on others' land in such a way as to harm the land or growing crops."  *Livestock*, Black's Law Dictionary (12th ed. 2024).  Feral animals have reverted to a wild state and therefore are not *kept* by anyone *for* any particular use or profit.

The dictionary entries above also accord with the definition that accompanied 36 C.F.R. § 2.60 when it was first promulgated: "domesticated animals that are personal property kept for commercial purposes."  48 Fed. Reg. 30252, 30273 (June 30, 1983) (citing the definition set forth in 36 C.F.R. § 1.4).  While the definition of "livestock" was later altogether removed from the regulations, it still indicates that feral animals were not intended to fall within the meaning of "livestock" at the time 36 C.F.R. § 2.60 was codified. Moreover, at least one other section of Title 36 of the Code of Federal

---

[6] Available at *Livestock*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/livestock (last accessed Oct. 16, 2024).

[7] Available at *Livestock*, Oxford English Dictionary, https://www.oed.com/dictionary/livestock_n?tab=meaning_and_use#39013048 (last accessed Oct. 16, 2024).

Regulations, governing the Forest Service, continues to define "livestock" as "animals of any kind kept or raised for use or pleasure." 36 C.F.R. § 222.1 (2024); *see New Mexico Cattle Growers' Ass'n v. United States Forest Serv.*, No. CIV 23-0150 JB/GBW, 2023 WL 2185698, at *11 (D.N.M. Feb. 22, 2023) ("The Court concludes that, because the C.F.R.'s definition of 'livestock' includes only 'animals . . . kept or raised for use or pleasure[,]' 36 C.F.R. § 222.1, the Gila Cattle are not 'unauthorized livestock' because, as *feral animals*, they are not 'kept or raised for use or pleasure[.]'" (emphasis added)).[8]

Second, the language of 36 C.F.R. § 2.60 is permissive, and does not require the NPS to remove or otherwise manage the horses. The regulation specifically states that "[l]ivestock trespassing in a park area *may* be impounded by the superintendent . . . ." 36 C.F.R. § 2.60 (emphasis added). It is well-settled that "the term 'shall' customarily connotes a command, whereas the term 'may' typically indicates authorization without obligation." *Moreno*

---

[8] The only contrary authority that Plaintiffs cite is a recent "Livestock Plan for Theodore Roosevelt [National] Park," which characterized the herd of feral horses at issue there as "livestock." (Doc. 73 at 3 n.4.) The federal Defendants point out that the Theodore Roosevelt NPS Unit terminated that planning process in response to public comments, including some that disputed that the feral horses constituted "livestock." (Doc. 79 at 9 n.4.) More importantly, notwithstanding NPS's use of the term "livestock" in the terminated Theodore Roosevelt National Park plan, the Court here must turn to the term's "common and ordinary meaning." *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1193 (11th Cir. 2010). Feral horses simply do not fit the ordinary meaning of "livestock," rendering 36 C.F.R. § 2.60 inapplicable to this case.

*v. Wolf*, 558 F. Supp. 3d 1357, 1367 (N.D. Ga. 2021) (quoting *Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 609 F.3d 338, 342 (4th Cir. 2010)); *see Yusim v. Department of Labor*, 645 F. App'x 967, 969 (11th Cir. 2016) (holding the Department of Labor had no duty to act under a regulation that stated it "may participate" as a party or amicus curiae in a proceeding). Moreover, an agency's decision not to take a particular "enforcement action"—here, impounding livestock—is "presumed immune from judicial review under § 701(a)(2)" as an action "committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (citing 5 U.S.C. § 701(a)(2)).

In sum, 50 C.F.R. § 30.11 does not apply here and 36 C.F.R. § 2.60 is inapplicable to the feral horses of Cumberland Island because they are not "livestock," and the regulation does not give rise to a legally required duty to remove or manage the horse population.

### e. 1984 General Management Plan

Plaintiffs also argue that the 1984 General Management Plan for Cumberland Island National Seashore (the "GMP") requires the NPS to remove feral horses from the island. (Doc. 54 ¶¶ 91, 99.) The Organic Act instructs the NPS to prepare general management plans for each National Park: "General management plans for the preservation and use of each [National Park] System unit, including areas within the national capital area, shall be prepared and revised in a timely manner by the Director." 54 U.S.C.

§ 100502.   These plans must include "(1) measures for the preservation of the area's resources; (2) indications of types and general intensities of development (including visitor circulation and transportation patterns, systems, and modes) . . . ; (3) identification of and implementation commitments for visitor carrying capacities . . . ; and (4) indications of potential modifications to the external boundaries of the System unit[.]" *Id.*

The   Seashore's   GMP—published   in   1984—"provides   overall management direction for Cumberland Island for the foreseeable future (approximately 5-10 years)." (Doc. 90-1 at 4).   With respect to feral animal populations, the GMP states that

> Feral animals *will be removed where they are detrimental to natural and cultural resources, and they will be transported to the mainland*.   This policy will necessitate the complete removal of feral hogs and the close monitoring of the population size of feral horses.   At present feral cattle have been contained and no longer roam the island freely.   The feral horse population *will be managed to insure a [ ]healthy representative herd* which should promote, in part, short-grass characteristics favorable for the nesting of shore birds.

(Doc. 90-1 at 34) (emphasis added).[9]

---

[9] As discussed in a preceding section of this order, courts may consider a document that is incorporated into the complaint by reference, so long as it is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson*, 107 F.4th at 1300.   The GMP satisfies both requirements as it (1) provides the basis for one of Plaintiffs' § 706(1) claims, and (2) the parties do not dispute its authenticity.   (Doc. 54 ¶¶ 91, 99; Doc. 90-1; Doc. 91.)

This provision may reasonably be read to call for the NPS to take discrete actions to remove feral animals that are "detrimental to natural and cultural resources," and maintain the horse population at a level consistent with a "healthy representative herd."   One district court has found that a Forest Service plan specifying "the maintenance of a wild horse herd averaging 100 head" was sufficiently discrete to satisfy the first prong of *SUWA*.  *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1279 (D. Or. 2012).  While the GMP here does not set a specific level for Cumberland Island's horse population—thereby leaving discretion for the NPS to determine the requirements of a "healthy representative herd"—it nevertheless states that the herd "will be managed" to that end.[10]

Even assuming that the GMP calls for a discrete agency action, however, it fails *SUWA's* second requirement—that is, any action called for by the GMP is not *legally required*.  The GMP, according to its terms, merely "*provides overall management direction* for Cumberland Island for the foreseeable future (approximately 5-10 years)."  (Doc. 90-1 at 4) (emphasis added).  It is a preliminary planning document designed to be supplemented by more specific

_____

[10] As *SUWA* explained, an agency action can "involve[ ] the exercise of judgment and discretion" yet remain "discrete" enough for a court to compel the action.  542 U.S. at 66.  For instance, "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  *Id.* at 65.

plans: "Further detail on *the management concepts* included in this GMP will be provided through subsequent *action planning documents* and site plans such as Resource Management Plans, Development Concept Plans, Interpretive Plans and various site plans." (*Id.*) (emphasis added).

As such, the GMP is analogous to the land use plan provisions that *SUWA* held unenforceable under § 706(1). *SUWA* explained that courts cannot compel compliance with agency plans "absent clear indication of binding commitment in the terms of the plan." 542 U.S. at 69. "Quite unlike a specific statutory command . . . , a land use plan is generally *a statement of priorities*; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Id.* at 71 (emphasis added). In such a planning document, language that an agency "'*will*' take this, that, or the other action" does not necessarily create a binding commitment. *Id.* at 69 (emphasis added). These "'will do' projections of agency action" are just that—*projections* which are not intended to bind the agency. *Id.* at 72. "It would be unreasonable to think that either Congress or the agency intended otherwise, since land use plans nationwide would commit the agency to actions far in the future, for which funds have not yet been appropriated." *Id* at 71.

The cited language in the GMP is precisely the kind of general "statement of priorities," *SUWA*, 542 U.S. at 71, providing "overall management direction," (Doc. 90-1 at 4,) that cannot sustain a legally required

duty under § 706(1).  The GMP's introductory language, referring to "overall management direction" and "management concepts," to be further detailed in subsequent planning documents, indicates the agency did not intend to create a "binding commitment."  *SUWA*, 542 U.S. at 69; *see, e.g.*, *Stout*, 869 F. Supp. 2d at 1279-80 (holding that a Forest Service Plan calling for "maintenance of a wild horse herd averaging 100 head" was not legally enforceable under §706(1) because it was "a policy document that does not bind particular implementation decisions").  Because the GMP lacks any such commitment, the Court cannot compel general enforcement with its terms.

### f.  1990 Statement for Management

The Plaintiffs contend that the 1990 Statement for Management for Cumberland Island National Seashore ("1990 Statement") compels the NPS to remove or manage the feral horse population.  (Doc. 54 ¶¶ 92, 99.)  But like many of the other agency documents Plaintiffs cite, the 1990 Statement is not sufficiently *discrete* to require such a specific agency action with respect to Cumberland Island's horses.  The 1990 Statement broadly calls for the NPS to "manage native wildlife populations [on Cumberland Island] so as to achieve a balanced eco-system free of interferences created by man" and to "reduce the competitive impact on native wildlife by exotic animals and the deleterious effect on vegetation by exotic animals by the most effective, feasible means possible."  (*Id.* ¶ 92.)  These broad objectives—managing wildlife to "balance[ ]

the eco-system" and "reduce the competitive impact . . . by the most effective, feasible means possible"—leaves the NPS "a great deal of discretion in deciding how to achieve [those goals]." *SUWA*, 542 U.S. at 66-67. They certainly do not "mandate, with the clarity necessary to support judicial action under § 706(1)," that the NPS remove the feral horse population, or otherwise manage the horses in any particular manner. *Id.*

### g. NPS Director's Order #41: Wilderness Stewardship

Finally, Plaintiffs assert that NPS Director's Order #41 ("Order #41") regarding invasive species sets forth a discrete legal duty to remove or otherwise manage the horse population on Cumberland Island. (Doc. 54 ¶¶ 116-17.) Order #41 instructs that "[n]on-native invasive plant and animal species must not be brought into wilderness." Order #41 § 6.9.[11] "The objective of treatment within wilderness should be the eradication of the invasive species. *If eradication is not feasible*, the objective of treatment should be to contain the invasion, preventing spreading." *Id.* (emphasis added). The Order directs parks to complete a "minimum requirements analysis" (MRA) to identify whether a proposed action "to inventory, monitor, control or eradicate

_____

[11] The NPS Director's Order #41 is available at https://www.nps.gov/subjects /policy/upload/DO_41_5-13-2013.pdf (last accessed Oct. 18, 2024). It can be considered at the motion to dismiss stage, as a document incorporated into the complaint by reference, *Johnson*, 107 F.4th at 1300, because it (1) forms the basis for one of Plaintiffs' § 706(1) claims, and (2) the parties do not dispute its authenticity. (Doc. 54 ¶¶ 116-17.)

non-native invasive species" is necessary for administration of the wilderness area. *Id.*, *see also id.* § 6.4.

Order #41 states neither a discrete nor a legally binding duty under § 706(1). While it outlines an overall "objective" of eradicating invasive species, Order #41 expressly conditions any specific action on the NPS first conducting an MRA. It also notes that parks "should use Integrated Pest Management (IPM) to guide invasive species planning and implementation and develop management plans using IPM that may require [National Environmental Policy Act] and minimum requirements compliance." *Id.* § 6.9. Thus, the Order cannot be reasonably understood to call for the automatic removal of every feral animal or for the adoption of any particular management strategy. Instead, it explicitly instructs NPS units to exercise discretion, consistent with MRA and IPM best practices, in controlling invasive species. The result of the MRA and IPM analyses, of course, might change the course of action each NPS unit elects to take to manage a particular invasive species.

Moreover, the Order does not *legally require* the NPS to remove or otherwise manage invasive species under § 706(1) because it does not provide any "clear indication of binding commitment." *SUWA*, 542 U.S. at 69. To the contrary, like the 2006 NPS Management Policies, it contains a disclaimer that the Order "is intended only to improve the internal management of the NPS, and is not intended to, and does not, create any right or benefit, substantive or

procedural, enforceable at law or equity . . . ."  Director's Order #41 § 2.  As explained in earlier sections of this order, where an agency's internal guidance document lacks any binding commitment, it cannot form the basis of a § 706(1) claim.

For the foregoing reasons, Plaintiffs have failed to identify any discrete and legally required duty that could sustain their § 706(1) claims.  This Court lacks subject matter jurisdiction over Plaintiffs' APA claims and Defendants' motions to dismiss are granted with respect to Counts I, II, and III.

## B. Endangered Species Act Claims

The Supreme Court once declared the Endangered Species Act (the "ESA") "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978).  The Act "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]"  *Id.* In Count IV of their amended complaint, Plaintiffs assert that Defendants have violated two provisions of the ESA—Section 7(a)(2) and Section 9(a)(1)— by failing to manage the horse population on Cumberland Island.  (Doc. 54 ¶¶ 124-70.)

Section 7(a)(2) of the ESA instructs federal agencies to consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service to "insure that *any action authorized, funded, or carried out by such agency . . . is*

not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" 16 U.S.C. § 1536(a)(2) (emphasis added).

Section 9(a)(1) of the ESA makes it illegal for any person[12] to "take" an endangered species.  *Id.* § 1538(a)(1)(B).  "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  "Harm" is defined as "an act which actually kills or injures fish or wildlife" and includes "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102.

### 1. Section 7 Failure to Consult Claim

Plaintiffs contend that the NPS has violated Section 7 of the ESA because it "has not engaged in the requisite consultation (formal or informal) regarding the free ranging of the horses despite the knowledge its action will

---

[12] The ESA defines a "person" as "an individual, corporation, partnership, trust, association, or any other private entity; *or any officer, employee, agent, department, or instrumentality of the Federal Government*, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States."  16 U.S.C. § 1532(19) (emphasis added).

affect listed species or critical habitat." (Doc. 73 at 34.)[13]  Again, Plaintiffs confuse agency *inaction* for *action*.

Section 7's consultation requirement, 16 U.S.C. § 1536(a)(2), is only triggered by an "affirmative" agency action, not an agency's "failure to act." *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1107-10 (9th Cir. 2006) (explaining that "'inaction' is not 'action' for section 7(a)(2) purposes"); *see also Forest Guardians v. Forsgren*, 478 F.3d 1149, 1158 (10th Cir. 2007) (holding that a Land and Resource Management Plan developed by the U.S. Forest Service did not constitute an "action" within the meaning of the ESA).  Other sections of the ESA "explicitly refer to an agency's failure to act," but Section 7(a)(2) does not.  *Matejko*, 468 F.3d at 1108.

Plaintiffs do not plausibly allege that NPS took any affirmative action related to the horse population that would trigger the Section 7 consultation requirement.  Moreover, Plaintiffs' attempt to recast the NPS's inaction with respect to the island's horse population as an "*action* in free ranging the horses" is unpersuasive.  (Doc. 73 at 34 (emphasis added).)  The NPS's failure to manage the feral horses cannot be characterized as an action "*authorized, funded, or carried out* by [the] agency."  16 U.S.C. § 1536(a)(2) (emphasis

---

[13] Plaintiffs only bring their Section 7 ESA claim against the federal Defendants.  They have disclaimed any Section 7 claim against the state Defendants.  (Doc. 80 at 2.)

added).  Indeed, the very problem that Plaintiffs complain of is that the NPS has *not* "authorized, funded, or carried out" any management of the horses.

To the extent that Plaintiffs argue that the various NPS plans they cite— including the 1984 General Management Plan for the Cumberland Island National Seashore, the 1988 Management Policies, and the 1995 Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia—constitute agency action that require ESA consultations, it is not clear that they are right.  (Doc. 54 ¶ 170.)  At least one Court of Appeals has found that although planning documents "may indirectly impact" an endangered species, "this does not make such policies, directions, and allowances 'action' requiring consultation within the meaning of [section] 7(a)(2)."  *Forest Guardians*, 478 F.3d at 1157.

But even if the NPS plans that Plaintiffs cite required ESA consultations when they were promulgated, the time for challenging any violation of the ESA has long passed.  The statute of limitations for claims against the United States, including those based on a failure to comply with the ESA's consultation requirement, is six years.  28 U.S.C. § 2401(a); *see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024) (explaining that the six-year statute of limitations "applies generally to suits against the United States unless the timing provision of a more specific statute displaces it"); *Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d 1075,

1087 (9th Cir. 2017); *Ctr. for Biological Diversity v. Hamilton*, No. 1:04-CV-2573-JTC, 2005 WL 8154724, at *1-2 (N.D. Ga. Aug. 24, 2005).  All plans to which Plaintiffs cite were promulgated more than six years ago.  Accordingly, Plaintiffs have failed to plausibly state a Section 7 ESA claim against the federal Defendants.

### 2.  Section 9 "Take" Claim

Plaintiffs assert that the state and federal Defendants have unlawfully harmed—or in the ESA's terminology, engaged in an unlawful "take" of—the loggerhead turtle (*Caretta caretta*) and the piping plover (*Charadrius melodus melodus*).  For instance, Plaintiffs allege that "[t]he loss of each egg and hatchling to trampling by a feral horse is an illegal "take" of *Caretta caretta*." (Doc. 54 ¶ 136.)  They further allege that "[t]he impairment of Cumberland Island's dynamic dune system caused by the grazing of the feral horses is a significant modification of the habitat critical to the breeding success of *Caretta caretta* and is an illegal 'take' of *Caretta caretta*."  (*Id.* ¶ 137.)  Plaintiffs also claim that "interference by Cumberland Island's feral horses with the piping plover's essential behavior patterns and the negative impacts of their grazing activities . . . is an illegal 'take' of *Charadrius melodus melodus*."  (*Id.* ¶ 159.)

While Plaintiffs plausibly allege that the feral horse population is harming the loggerhead turtle and piping plover populations, this harm cannot be attributed to Defendants under the ESA.  The ESA makes it "unlawful for

any person," including a state or federal agency, to "*take* any [ESA-listed] species."  16 U.S.C. § 1538(a)(1)(B) (emphasis added).  The definition of "take" is tied to the affirmative acts of a "person," and the verb "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  *Id.* § 1532(19).  Plaintiffs do not plausibly allege any affirmative agency conduct that could meet this definition.  As explained *supra*, Plaintiffs take issue with the Defendants' *lack* of any intervention to manage the horse population, not with any affirmative conduct that Defendants have engaged in.

In support of their Section 9 unlawful "take" claim, Plaintiffs cite several cases challenging federal agencies' *authorization* of livestock grazing on federal land under the ESA.  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011); *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, No. 4:13-CV-176-BLW, 2013 WL 3270363 (D. Idaho June 26, 2013); *Ctr. for Biological Diversity v. Moore*, No. CV 21-733 MIS/GBW, 2023 WL 7986136, at *1-8 (D.N.M. Nov. 17, 2023); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 820 F. Supp. 2d 1029 (D. Ariz. 2011).  None of these cases suggest that the Defendants here are engaging in an unlawful "tak[ing]" of an endangered species.

As an initial matter, two of the decisions that Plaintiffs cite do not even address Section 9's prohibition of "tak[ing]" a listed species, but rather Section 7's consultation requirement.  *Kraayenbrink*, 632 F.3d at 495-498 (addressing a Section 7 failure to consult claim, not a Section 9 illegal "take" claim); *W.*

*Watersheds Project v. U.S. Fish & Wildlife Serv.*, 2013 WL 3270363, at 1*-7 (analyzing Section 7's consultation requirement).  Moreover, the courts that identify a potentially unlawful "take" under the ESA do so on the basis of an affirmative agency action, such as the U.S. Forest Service's "*authorization* of certain allotments of livestock grazing . . . ."  *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 820 F. Supp. 2d at 1037 (emphasis added); *see also Ctr. for Biological Diversity v. Moore*, 2023 WL 7986136, at *5-8 (examining compliance with an "Incidental Take Statement" regarding the authorization of grazing).

Here, Plaintiffs have failed to plausibly allege any agency action that could constitute a "take" within the meaning of the ESA.  As Defendants stress, the feral horse population roamed freely on Cumberland Island before Congress established the Seashore.  That Defendants have not intervened to manage the horses does not mean they have engaged in an unlawful "take" of any ESA-listed species.  Because Plaintiffs have not plausibly stated any violation of the ESA, Defendants' motions to dismiss are granted with respect to Count IV.

### C. State Law Claims

Plaintiffs bring several Georgia state law claims against both the state and federal Defendants.  Count V asserts a violation of the Humane Care For Equines Act, O.C.G.A. §14-3-1, *et seq.*  (Doc. 54 ¶¶ 171-189.)  Count VI asserts

a violation of the Livestock Running At Large Or Straying statute. O.C.G.A. § 4-3-1, *et seq.* (*Id.* ¶¶ 190-200.) Count VII asserts that the state has failed to meet its public trust duties to protect Cumberland Island's natural resources and wildlife from impairment from the island's feral horses. (*Id.* ¶¶ 201-211.)

### 1. Federal Defendants

In their response to the federal Defendants' motion to dismiss, Plaintiffs did not present any argument regarding their state law claims and represented that they would move to withdraw all state law claims against the federal Defendants. (Doc. 73 at 23.) However, in a subsequent filing styled as "Plaintiffs' First Amendment to their First Amended and Restated Complaint," Plaintiffs indicated that they "assert Georgia state law claims against the Federal Defendants only with respect to the Humane Care for Equines Act, O.C.G.A. § 13-13-2." (Doc. 80 at 3.) While Plaintiffs have likely waived or abandoned any state law claims against the federal Defendants,[14] the Court will still address Plaintiffs' allegations concerning the Humane Care for Equines Act. (Count V.)

---

[14] *See, e.g.*, *Ramsey v. Bd. of Regents of Univ. Sys. of Georgia*, No. 1:11-CV-3862-JOF-JSA, 2013 WL 1222492, at *29 (N.D. Ga. Jan. 30, 2013), *aff'd*, 543 F. App'x 966 (11th Cir. 2013) ("When a party fails to address a specific claim, or fails to respond to an argument made by the opposing party, the Court deems such claim or argument abandoned."); LR 7.1(B), NDGa.

"Federal courts have jurisdiction over suits against the United States and its agencies only to the extent that sovereign immunity has been waived." *Thompson v. McHugh*, 388 F. App'x 870, 872 (11th Cir. 2010); s*ee United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Any waiver of sovereign immunity requires "a clear statement" from Congress, "together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003).

Plaintiffs' amended complaint contends that the federal Defendants "have accepted the applicability of the laws of the State of Georgia within the Cumberland Island National Seashore (waived sovereign immunity subject to the supremacy clause) in entering a Concurrent Jurisdiction Agreement." (Doc. 54 ¶ 173.) Plaintiffs do not cite any authority in support of this argument. The mere fact that federal and state authorities have agreed to exercise concurrent law enforcement jurisdiction over Cumberland Island does not constitute "a clear statement" waiving sovereign immunity and subjecting the federal government to suit under Georgia state law. Indeed, Plaintiffs do not identify any specific language in the Memorandum of Agreement for

Concurrent Jurisdiction (Doc. 49-8) that purports to subject the United States to Georgia's Humane Care for Equines Act, or any other state statute. The Court's own review has revealed no such terms.

As such, Plaintiffs' state law claims against the federal Defendants fail for lack of subject matter jurisdiction. The federal Defendants' motion to dismiss is granted with respect to Counts V, VI, and VII.

### 2. State Defendants

The Court declines to reach the merits of the state law claims asserted against the state defendants. Having dismissed Plaintiffs' ESA claim (Count IV)—the single claim conferring federal question jurisdiction with respect to the state defendants—only state law claims remain against the state defendants. "When all federal claims are dismissed before trial, a district court should typically dismiss the pendant state claims as well." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018). Accordingly, the Court dismisses without prejudice Counts V, VI, and VII against the state defendants.

## V.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss (Doc. 66, 67, 68) are **GRANTED**.  Counts I, II, III, and IV are **DISMISSED**.  Counts V, VI, and VII are **DISMISSED** as against the federal Defendants and **DISMISSED WITHOUT PREJUDICE** as against the state Defendants.   Plaintiffs' emergency motion for equitable relief (Doc. 83) is **DENIED AS MOOT**.  The Clerk of Court is directed to close this case.

**SO ORDERED** this 7th day of November, 2024.

_____
SARAH E. GERAGHTY
United States District Judge